[Sac. No. 6308. In Bank. Jan. 6, 1953.]

SUTTER BUTTE CANAL COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and MARY BAGGETT et al., Respondents.

Millington & Millington and Seth Millington for Petitioner.

Edmund J. Thomas, Jr., Robert Ball, T. Groezinger and Leonard M. Levy for Respondents.

SCHAUER, J.—Petitioner-employer, a corporation, seeks annulment of an award of increased benefits based upon a finding of respondent Industrial Accident Commission that

the death of one of petitioner's employes was caused by the employer's serious and wilful misconduct. (See Lab. Code, § 4553.) We have concluded that the award cannot be sustained, in that the evidence is insufficient to establish the minimum elements of serious and wilful misconduct as those elements are enunciated in *Mercer-Fraser Co.* v. *Industrial Acc. Com.* (1953), *ante,* p. 102 [251 P.2d 955], and cases there cited, and that the award should, therefore, be annulled.

From the record it appears that the deceased employe, aged 36, was employed as a laborer by petitioner, and that he met his death by drowning when he fell from a concrete dam on top of which he was working. The dam, constructed by petitioner across the Feather River over 30 years ago, was some 8 feet high, 800 feet long, and 4 feet wide across the top. It was maintained for the purpose of raising the elevation of water in the river so as to discharge it into a diversion canal for distribution for irrigation purposes. Along the center line of the top of the dam, 2½-inch steel pipes were imbedded in cement postholes at about 4-foot intervals for the dam's full length; the pipes extended 30 inches above the top of the dam.

Each year, during spring or early summer when the level of the river dropped to the point where water would not flow into the canal in sufficient volume, flashboards were placed along the top of the dam, attached to and resting against the steel uprights, and were left in place until the end of the irrigation season in the fall, at which time they were removed. The flashboards were 2 inches thick, 12 inches wide, and 16 feet long, and were installed two high (i.e., so as to make a 24-inch flashboard rise over the concrete top of the dam.) This practice had been followed for some 32 years.

In September, 1950, Baggett (the deceased employe), and two other workmen, Roseman and Heape, under instructions from petitioner's foreman were engaged in removing the flashboards. Roseman was prying the boards loose, and Baggett and Heape were lifting them out and carrying them to the side of the dam. It was about 2:30 o'clock in the afternoon. Water was flowing over the top of the flashboards to a depth of about 6 inches, giving approximately a 30-inch head over the top of the dam when the boards were removed. When Baggett and Heape had lifted off one of the top boards, they started to carry it shoulder high across the top of the dam and Baggett necessarily stepped into the water flowing through the place where the removed board had been. He

slipped and fell over the side of the dam, which had a down slope of 45 degrees, into the pool below. Roseman and Heape testified that Baggett was smiling as he went down the slope, and started to swim downstream to shore, in no visible distress; after swimming about 100 feet he waved his arms several times and sank; Heape thought "he got a cramp"; Roseman then jumped in to assist Baggett but was unable to reach him before the latter drowned; the two workmen when they saw Baggett slip and fall "had no concern, didn't think anything was wrong," and if "there had been any difficulty . . . [could] have gone in right at the start"; the current below the dam was not still but there was "Not too much" rush of water; the witnesses had never "slipped or fallen or had any difficulty" on the dam, and had never heard of anyone else doing so in the several years they had worked for petitioner company; although there was a "little moss" on top of the dam, it was not especially slippery where the three men were working, "We were walking back and forth on that without any trouble"; there is no great "rush of water" over the dam in the fall when the flashboards are removed; Baggett was wearing "ordinary working clothes," and was barefooted; none of the three workmen was wearing a life jacket; they had never been furnished such jackets; and there was no cable or life line across the dam, no boat downstream, and nobody "in attendance downstream for any purpose."

Whitinger, a laborer and subforeman for petitioner company since 1924, testified that the foreman told him not to go out on the dam to help remove the flashboards, but "to let the younger men go"; many times before he had helped with the removal; he never knew of anyone else slipping off the dam in all his years with the company. Gifford, construction superintendent and general foreman for petitioner company for some 32 years, testified that no one had gone off the dam before while removing or putting in the flashboards; for many years the State Compensation Insurance Fund has been the workmen's compensation insurance carrier for petitioner company, and has sent its safety engineers to go over petitioner's system to recommend safety measures, and petitioner has "done everything their safety engineers recommended"; such engineers had never "recommended any safety device on the dam other than those we have had there"; petitioner did not furnish the men with life lines, "they preferred to work without them." and Baggett himself had said "I don't want any-

thing on. . . . When I get out of this I don't want no obstructions. When I get in the water I want to swim''; the Feather River is ''crystal clear.''

Respondent commission, after issuing its award based on a finding of serious and wilful misconduct, granted the employer's petition for rehearing. The three commissioners constituting Panel One of the commission then personally ''viewed the premises of the dam site,'' and thereafter the decision on rehearing or reconsideration was issued, again awarding increased benefits based upon a finding of serious and wilful misconduct of the employer ''in that said employer wilfully and knowingly failed and neglected to pro- vide a safe place of employment, and failed and neglected to use safety devices and safeguards to render said place of employment safe, and failed and neglected to use safety devices and safeguards to render the employment and said place of employment safe.'' This petition for review followed.

As grounds for annulling the award petitioner contends that the evidence does not support the findings and that the . findings do not support the award. More particularly it is urged that since it is undisputed that for the more than 30 years that the dam had been maintained and the same method of installing and removing flashboards had been followed no one had gone off the dam before while working with the flashboards ''there wasn't the slightest reason to believe that there was any danger out there at all,'' and that ''had not Baggett got a cramp he would have swam ashore, regarded the whole thing as funny . . .'' Petitioner also relies on the fact that the engineers of their insurance carrier apparently did not regard the working conditions on the dam as being dangerous, and argues further that the employe could have seized one of the steel posts spaced 4 feet apart along the top of the dam thereby further justifying the assumption by the employer that the work was safe.

██ Respondent commission's view of the premises, made some 11 months after the death of Baggett, does not constitute independent evidence ''which must be presumed to support the finding of serious and wilful misconduct'' (see *Ethel D. Co.* v. *Industrial Acc. Com.* (1934), 219 Cal. 699, 704 [28 P.2d 919]; *Simmons Co.* v. *Industrial Acc. Com.* (1945), 70 Cal.App.2d 664, 669-670 [161 P.2d 702]; *Estate of Sullivan* (1948), 86 Cal.App.2d 890, 895 [195 P.2d 894]; *Camicia* v. *Camicia* (1944), 65 Cal.App.2d 487, 490-491 [150

P.2d 814]) inasmuch as there was no showing that conditions were the same then as at the time of the accident.
■ The commission argues, however, that the employer's suggestion that only the "younger men" do the work of removing the flashboards shows the employer recognized the "inherent danger" of the work. The commission also suggests that the employer might have furnished life lines but does not suggest how they could have been used, suggests a rowboat at the foot of the dam, and suggests that life jackets might have been used although from the evidence it appears doubtful that Baggett would have used one. In other words, the commission appears to take the view that "something" should have been done, and to have based its conclusional finding of serious and wilful misconduct controllingly on the bare fact that an accident did occur. There is not the slightest evidence to support a finding that the petitioner deliberately sent its employes to work upon the dam either (1) knowing that the conditions thereon constituted an immediate hazard which would probably cause serious injury or death to one or more of them, or (2) that it so acted with positive, active, wanton, reckless and absolute disregard for possible consequences of that nature.

Inasmuch as the evidence is, therefore, as a matter of law insufficient, the award must be and it is annulled.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent. The evidence supports the finding of the commission that the employee lost his life by reason of the serious and wilful misconduct of his employer. Here we have an 8-foot dam upon which are two boards extending 2 feet above the top. Upstream (behind) from the boards is a 30-inch head of water. While the top of the dam is 4 feet wide the space left for a workman removing the boards is only 2 feet because the boards are midway on the top. The top of the dam was covered with moss and mud as it naturally would be by reason of there being no flow of water over it and the seepage of water through the boards. When a board was removed by the deceased and another employee there was a rush of the 30-inch flow of water around the legs of the deceased. No life lines were fixed along the top of the dam. That could have been done easily and they would have afforded a saving handhold if an employee slipped.

The majority opinion lays stress on the evidence that the safety engineers for the employer's insurance carrier made inspection of its works and never made any recommendations with reference to the dam. That evidence does not show, however, whether the dam was ever inspected, that the inspectors knew of the practice of removing the boards, or that they had ever been present when that work was in progress. That evidence is therefore of little value.

Reliance is also had upon evidence that there had never before been an accident during the removal of the boards. However, two of the witnesses who testified to that effect had only been employed for a short time and had participated in the removal of the boards only once or twice. The employer's superintendent testified that over a long period of time no accidents had occurred, but because of his interest the commission could view his testimony with suspicion.

The majority opinion concedes that the view of the dam by the commission would be independent evidence supporting its decision but states that there was no showing that the conditions were the same at the time of the inspection. The time elapsing (11 months) is not sufficient upon which to base a conclusion of law that conditions were not the same. Where we have permanent things such as a dam and a stream the presumption is that conditions remain the same (see Wigmore on Evidence (3d ed.) § 437; Code Civ. Proc., § 1963 (32)). It was incumbent upon the employer to show that conditions were different. That it failed to do. Moreover, it did not object to the inspection and relies strongly, as does the majority opinion, on evidence that no prior accidents had happened which would be irrelevant unless the conditions were substantially the same at all times. Therefore, the view of the premises alone supports the award.

The conduct of the employer was in direct violation of the law requiring an employer to furnish a safe place to work and adopt all reasonable means necessary to achieve that end. (Lab. Code, §§ 6400 et seq.)

The views expressed in my dissenting opinion in *Mercer-Fraser Co.* v. *Industrial Acc. Com., ante,* p. 102 [251 P.2d 955], this day filed are equally applicable here, but I desire to point out particularly that the majority opinion here cannot be reconciled with the following cases: *Parkhurst* v. *Industrial Acc. Com.,* 20 Cal.2d 826 [129 P.2d 113] ; *Hatheway* v. *Industrial Acc. Com.,* 13 Cal.2d 377, 380 [90 P.2d 68] ; *Hoffman* v. *Department of Industrial Relations,* 209 Cal. 383

[287 P. 974, 68 A.L.R. 294] ; *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.*, 209 Cal. 412 [288 P. 66] ; *Gordon* v. *Industrial Acc. Com.*, 199 Cal. 420 [249 P. 849, 58 A.L.R. 1374] ; *Blue Diamond Plaster Co.* v. *Industrial Acc. Com.*, 188 Cal. 403, 409 [205 P. 678] ; *Johannsen* v. *Industrial Acc. Com.*, 113 Cal.App. 162 [298 P. 99].

While the above cited cases differ factually from the case at bar the philosophy and legal concept of those cases is equally applicable here. The dangerous character of the place where the employees were required to work was obvious. If it was not known it was of such a character that it should have been known. Steps could easily have been taken to alleviate the danger but the employer did nothing whatsoever and sent the employee on that dangerous mission with reckless disregard of his safety.

The majority here is obviously opposed to the philosophy and legal concept of the above cited cases, or, more obviously, the majority is opposed to an award for serious and wilful misconduct in any case. The decision in this and kindred cases of recent vintage demonstrates the truth of this statement.

The record here is clearly sufficient to support the findings of the commission and I would therefore affirm the award here made.