[S. F. No. 16874. In Bank. Feb. 1, 1944.]

BETHLEHEM STEEL COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and KENNETH E. BRINKLEY, a Minor, etc., et al., Respondents.

R. P. Wisecarver for Petitioner.

Thelen, Marrin, Johnson & Bridges, Gardiner Johnson, Walter McGovern, Christopher M. Bradley and Herbert W. Erskine as Amici Curiae on behalf of Petitioner.

Everett A. Corten, Dan Murphy, Jr., and Albert Picard for Respondents.

CARTER, J.—The Industrial Accident Commission made an award of increased compensation to the dependents of

Charles W. Brinkley for his death on the ground that it was caused by the serious and wilful misconduct of Brinkley's employer, Bethlehem Steel Company, a corporation. The death occurred during and arose out of the course of Brinkley's employment. The employer now petitions to have the award annulled.

The Industrial Accident Commission found that petitioner was guilty of serious and wilful misconduct through its executive, managing officers and general superintendents, in that it had knowingly and wilfully violated a safety order of the Commission reading as follows: "Transportation by Trucks. (d) Workmen shall not ride on top of loads that may shift, topple over, or become unstable. (e) All loads shall be *secured against displacement.*" (Emphasis added.)

Petitioner's main contention is that the evidence is insufficient to support the foregoing finding.

On December 31, 1940, Brinkley, a structural steel worker, was working with a crew loading, hauling and unloading steel beams. The general work in progress was the dismantling of a building. The steel was removed from the building, loaded on trucks where removed, and hauled to a storage area varying in distance depending on the point of loading. The particular haul in question involved a distance of 100 to 150 feet. The trucks traveled upon a construction road which was rough and uneven, being "full of depressions and chuck holes." The truck which was used for the hauling had a flat bed and no side stakes. The steel beams were I shaped, with dimensions of about 3 feet deep, 10 inches wide at the flanges and 30 feet long. They each weighed 3,200 to 3,500 lbs. At the time Brinkley suffered the fatal injury, several beams had been loaded on the truck. The evidence as to the number varies between six and nine. All except two of the beams were placed on the bed of the truck, resting on the flange side. Two beams were laid on top of the others, resting on their flat side.

Brinkley and his fellow worker, Black, remained on the truck after it was loaded to ride to the storage area and then assist in the unloading. After the truck had proceeded a short distance at a slow speed, it apparently struck a hole or a rough spot in the road, four beams fell from the truck on the right side on which Brinkley was riding and one on the left side where Black was riding. The beams crushed

Brinkley, fatally injuring him. There were no chains, ropes or cables securing the beams and they were not fastened to the bed of the truck.

 The commission was fully justified in finding that subdivision (e) of the safety order, that loads must be secured against displacement, was violated. It may well have inferred that if chains, cables or similar devices had been used the beams would not have fallen from the truck and that security against displacement required the use of some device of that character. Indeed, an inference would arise that the load was not secured against displacement from the very fact that the beams did fall from the truck under the circumstances. In *Newkirk* v. *Los Angeles Junction Ry. Co.*, 21 Cal.2d 308 [131 P.2d 535], this court held that an inference of the violation of a safety measure of the Safety Appliance Act (45 U.S.C.A. 11), requiring efficient hand brakes, may arise from the failure of the brake to operate properly when used in the customary and usual manner.

Petitioner refers to evidence indicating that the placing of the two beams on top of the others interlocked them by means of their flanges and made the load secure. If there were seven standing beams with a 10-inch width, the flange of the beam resting on top of four of the standing beams could not interlock that group on one side. Even if there were six standing beams, the two groups of three would not have been interlocked. If the edge of the flange of the top beams rested on top of the standing beams rather than extending down the side only, the weight would tend to secure the beams, but Goucher, the foreman of the crew with which Brinkley was working, testified: "Q. Now as you have drawn this there is no tieup of any kind or character whatsoever between the three girders standing up or the one on top of the right side of the truck and three girders standing on the left hand side of the truck? A. I don't think there was. Q. Were the two top girders in any way connected together? A. No." There is also evidence that 75 to 100 loads of seven beams each had been hauled without casualty. That did nothing more than create a conflict in the evidence which was resolved against petitioner.

 The part played by the employer's violation of a safety order or rule of the commission in the determination of whether or not he is guilty of serious and wilful misconduct, was stated recently by this court in *Parkhurst* v. *Indus-*

*trial Acc. Com.,* 20 Cal.2d 826, 830 [129 P.2d 113], in commenting on the employer's violation of a law:

"It is true that not every violation of a statute is serious and willful misconduct . . . '. . . Where there is a deliberate breach of law . . ., which is framed in the interests of the working man, it will be held that such a breach . . . amounts to serious misconduct.' '' And again at page 830 that:

"The test under these cases is whether the employer knowingly or willfully committed an act that he knew or should have known was likely to cause harm to his employee."

The above rules viewed in the light of the facts in this case justified the commission's finding of serious and wilful misconduct on the employer's part. We have seen that the evidence was sufficient to establish a violation of the safety order. Petitioner's superintendent Scanland and Goucher, the foreman on the work in which Brinkley was engaged, knew of the safety order. The road over which the truck hauled the beams was rough, hence a load not properly secured was likely to shift. Loads were secured by chains or ropes on occasions. Goucher, the foreman, testified: "Q. Were there some of the loads you took out of there you did tie down with chains? A. Yes. Q. And there were chains and ropes there which you used whenever necessary? A. Yes, they had them on the premises, plenty of them." Scanland testified: "Q. Were those girders fastened to the truck in any way? A. I don't think they were. No, I saw no indication that . . . I saw the load after it was off, but I saw no indication of it having been fastened. Q. Aren't there safety measures that require that girders of that type be fastened to the truck? A. Yes, there is. Q. Then the safety regulations were not being complied with? A. Well, this safety applies to moving loads on highways, as I understand it." No device or method was used to secure the load except the arrangement of the beams, which we have seen probably would not keep one or the other groups of standing beams from shifting. There were chains available for securing loads. Scanland when asked whether compliance with the safety regulations had been had, replied: "Well, this safety applies to moving loads on highways, as I understand it." The clear implication is that the order was knowingly not observed in the instant case. Applying the foregoing test the commission was justified in concluding that the employer

knowingly and wilfully committed an act that he knew or should have known was likely to cause harm to the employee. In *Ethel D. Co.* v. *Industrial Acc. Com.*, 219 Cal. 699 [28 P.2d 919], the safety order required the maintenance of secure handholds on a ladder from which the employee fell. There was grease on the platform from which the employee was descending. This court said at page 704:

"It may be conceded that, generally speaking, the mere failure of an employer to comply literally with the requirement of a safety order of the Industrial Accident Commission does not of itself justify a finding that the employer is guilty of serious and wilful misconduct. *In the final analysis, the circumstances presented by the evidence in any case will be determinative of the question of whether or not the employer's act* may properly be characterized as 'serious and wilful misconduct.' What would amount to no more than simple negligence in one situation may well be denominated serious and wilful misconduct in another . . . In the instant case the continued presence upon and about the derrick of so slippery a substance as crude oil would seem to point unmistakably to the necessity of strict compliance with the provisions of the commission's Safety Order 1618 and to suggest to the person in charge of the oil-well that a ladder utilized by workmen should be provided with secure handholds rather than with such makeshift supports as the end of a bolt or an upright post supporting a railing. At all events, *the question of whether, under the circumstances, the employer should have known that the failure to provide more secure and more readily accessible handholds would be so likely to jeopardize the safety of employees as to evince a reckless disregard for their safety and a willingness to inflict injury, was a question of fact to be determined by the referee to* whom the evidence in the case was submitted." (Emphasis added.)

■ There is evidence that Goucher thought the load was properly secured against displacement. The rule on that subject is stated in *Hatheway* v. *Industrial Acc. Com.*, 13 Cal.2d 377, 381 [90 P.2d 68]:

"The cases are quite uniform to the effect that permitting employees to work under dangerous conditions which are capable of being guarded against, constitutes such a reckless disregard for the safety of the employees that the commission's finding that such conduct is serious and wilful will not

be disturbed. The mere fact the employer did not believe the condition was dangerous does not relieve him from liability. Thus in *Blue Diamond [Plaster] Co.* v. *Industrial Acc. Com.,* 188 Cal. 403, 409 [205 P. 678], the employee was killed as a result of the failure of the employer to place guards on machinery. The managing agents of the employer testified that they knew of the condition, but stated that they did not consider the condition unsafe. 'Their mistake in judgment upon that subject cannot be held to relieve their employer from liability.' "

■ Finally, it must be remembered that whether serious and wilful misconduct of the employer caused the employee's injury is essentially one of fact and the commission's determination will not be disturbed if it has any evidentiary support. (*Parkhurst* v. *Industrial Acc. Com., supra.*)

■ The employer had a rule forbidding its employees to ride upon the loaded trucks. Brinkley was riding upon the truck when he was injured. However, even if it be assumed that he was knowingly violating that rule at the time of the accident, and that such constituted wilful misconduct, it is no defense in this proceeding. Section 4551 of the Labor Code provides: "Where the injury is caused by the serious and wilful misconduct of the injured employee, the compensation otherwise recoverable therefor shall be reduced one-half, *except*:

"(a) *Where the injury results in death.*

"(b) . . . .

"(c) Where the injury is caused by the failure of the employer to comply with any provision of law, or any safety order of the commission, with reference to the safety of places of employment." (Emphasis added.) The serious and wilful misconduct of the employee is not a defense to a claim for ordinary compensation if the injury occurring by reason of the misconduct of the employee resulted in his death. (*Western Pac. R. R. Co.* v. *Industrial Acc. Com.,* 193 Cal. 413 [224 P. 754].) It must also be true that it is not a defense when the claim is for additional compensation by reason of the serious and wilful misconduct of the employer. In the instant case the injuries suffered by Brinkley arose out of and occurred in the course of his employment and his death resulted. The commission's finding that the employee was injured by reason of the serious and wilful misconduct of

the employer, is supported by the evidence. Furthermore, it should be observed that the rule against riding the loads was not always enforced. Although there is sharply conflicting evidence on that subject, Black, Brinkley's fellow employee, testified: "Q. Mr. Black, were you and Mr. Brinkley riding this load the same way you had done on previous occasions? A. Yes. Q. And you have never been told not to ride the load that was not a shaky load? A. Well, you see some of these loads we had loaded up we put ropes and we put chains on some of them and Mr. Goucher had told us to be careful of the shaky loads. I heard him say that, and this being an apparently safe load there was no mention of this particular load. Q. And there was no mention not to ride loads of this kind? A. Not that I can recall. Q. Hadn't Mr. Goucher taken men off of these loads before when he found them riding? A. I could not say, he had never taken me off before. Q. Do you know if Mr. Goucher had ever seen you riding this type of load and he did not speak to you? A. He probably has. Q. Do you know whether he ever saw you riding this type of load? A. Sure . . . Q. Do you know whether he ever saw you riding there?. . . Q. After the load was complete? A. Yes. Q. And the driver started to go? A. Yes. Q. When did he do that, can you give us any time? A. No. Q. No time at all? A. No, but it happened a number of times. Q. You think it happened a number of times that he saw you? A. Sure." Under these circumstances the injury was the result of the failure to secure the beams against displacement, rather than the riding of the load. The case of *Guy F. Atkinson Co.* v. *Industrial Acc. Com.*, 38 Cal. App.2d 366 [101 P.2d 156], is clearly distinguishable. There the main basis of the decision was that none of the persons mentioned in section 4553(c) (managing officers, etc.) knew that a guard had not been installed, and if the employee killed were a person in that class, his death resulted solely from his failure to install the guard. In *Folsom* v. *Industrial Acc. Com.*, 3 Cal.App.2d 282 [38 P.2d 786], the court merely affirmed the commission's finding that the employee's conduct was the cause of the injury.

It is earnestly contended that petitioner, being a corporation, was not guilty of serious and wilful misconduct because the persons mentioned in section 4553 of the Labor Code were not guilty of such misconduct. That section reads in

part: "The . . . compensation . . . shall be increased . . . where the employee is injured by reason of the serious and wilful misconduct of any of the following: (a) The employer, or his managing representative. (b) If the employer is a partnership, on the part of one of the partners or a managing representative or general superintendent thereof. (c) *If the employer is a corporation, on the part of an executive, managing officer, or general superintendent thereof.*" (Emphasis added.) The particular serious and wilful misconduct of which the commission found the employer to be guilty was that "at the time of the injury and death sustained by the deceased employee herein, the employer, through its executives, managing officers and general superintendents, did knowingly and wilfully, fail, refuse and neglect to comply with Construction Order 1168, subdivisions (d) and (e) thereof, issued by the Industrial Accident Commission . . ., to-wit: 'Order 1168. *Transportation by Trucks.* (d) Workmen shall not ride on top of loads that may shift, topple over, or become unstable. (e) All loads shall be secured against displacement.' "

 Petitioner argues that the placing of the two beams on top of those lying on the bed of the truck tended to make the load secure and constituted compliance with the safety order provision that loads shall be secured against displacement. However, a construction engineer and inspector of the commission, who investigated the accident two days after it occurred, testified that although the manner of loading the beams would tend to keep each individual beam from tipping, "it would raise the center of gravity so that the load as a whole . . . would probably tip easier," that "It is my opinion if the load had been secured by chains or cables of sufficient strength the accident would not have occurred," and that "I would say in some of these cases many times they are lucky that accidents just don't happen, but the potentiality is there, if they weren't secured properly then the potentiality of an accident is always there." He testified further that the size of the depressions in the area where the accident actually took place was from 8 to 10 inches and the size of the humps from 6 to 8 inches. This testimony fully supports the commission's finding that petitioner had failed to comply with the safety order and that such failure constituted serious and wilful misconduct.

 Petitioner corporation contends, however, that the acts found to constitute misconduct here were not those of "an executive, managing officer, or general superintendent" as specified by section 4553 of the Labor Code, but could be charged to no one higher in authority than Goucher, the foreman of the crew with which Brinkley was working. However, as shown by the evidence and as recited in petitioner's petition for writ of review, the work of dismantling the building "was entirely in the charge of Mr. Scanland, its [petitioner's] superintendent." Scanland testified that his office "was perhaps 50 feet from the site of the building, maybe 100. It was close by the building that was being dismantled"; that although he had not seen the loading of the particular haul in which Brinkley was killed and was in his office when the accident occurred, he had been on the scene, which was on the same tract of land 300 or 400 feet from his office, about thirty minutes or an hour earlier; that most of the time he was on the job "around that area during the demolition of this old building" and was *actively in charge* of the work; that he made tours of inspection. Under cross-examination he described generally the equipment that was being used in the particular operation involved and the method of its use. He was asked the following question and gave the answer quoted: "Q. Now, you have mentioned a few minutes ago something about the fact that you went along and checked these things as you went along; is that the way you did it? A. Yes. . . ." Scanland further testified that all of the loads of steel "that we felt were unsafe, they were chained, *and some loads that we felt were safe because they can be stacked and slung over, they did not chain"*; that as a safety measure he had "cautioned the foreman about men riding loads and not to permit them to ride on the load"; that there was a doubt in his mind about the safety of men riding on the loads; that it was a company rule that the men should not ride the loads, although he did not know whether the rule had ever been brought to Brinkley's attention; that he was familiar with the safety order requiring that loads be secured against displacement but that *"this safety applies to moving loads on highways, as I understand it"*; and that the "subforeman, Mr. Goucher" was "supposed" to carry out "orders of safety regulations" but that it was his, Scanland's responsibility to watch the subforeman. Goucher testified that dur-

ing the loading and unloading Scanland was "around there two or three times a day. He had a big territory and lots of men to look over, and he would come around and see if we were doing all right and then go on"; that the only orders he, Goucher, had received about securing or fastening the loads were that "when the truck looked unsafe they should fasten it"; and that he did not know whether Brinkley had received a copy of the company's book of rules, which forbade the men to ride the loads, although he had on several occasions ordered Brinkley off the loads.

The driver of the truck, A. J. Banchero, testified as follows: "Q. Did you ever hear anyone tell any of the men not to ride the load of girders at any time while you were employed there? A. No, sir. Q. How long were you employed there when this accident happened? A. Three or four months, something like that. Q. And during that entire time you had never heard any of the workmen told not to ride on the loads? A. No, sir. Q. And when you say 'No, sir,' you mean you have never heard the foreman tell anyone they should not ride? A. No one. Q. Did you ever hear anyone tell Mr. Brinkley at any time not to ride on the load or to get off the load? A. No, sir. Q. Did you see Mr. Scanland? A. No, I did not. Q. Do you know Mr. Scanland? A. Yes, sir. Q. Did you see Mr. Scanland there at any time while you were working there? A. Yes, quite a few days walking around. Q. Did you ever hear Mr. Scanland tell Mr. Brinkley or any of the workmen that they should not ride on the loads? A. No, sir. Q. Did you ever hear Mr. Goucher . . . tell Mr. Brinkley or anyone else that they should not ride on the load? A. No, sir. Q. At any time did you see Mr. Scanland or Mr. Goucher or anyone else tell either Mr. Brinkley or any of the other workmen to get off the load? A. No, sir. Q. Did you ever see any of these loads fastened on with chains or ropes or stakes or anything else? A. Down there? Q. Yes. A. Yes, to fasten some of the loads down. Q. When did they do that? A. When the loads were pretty bulky. Q. How often about at the time you were there? A. Oh, I could not say. I know they fastened the loads that were bulky and stopped at that. Q. Would you say it happened often or very seldom? A. Very seldom. Q. *Did they ever fasten any loads of girders? A. No, sir.*"

In view of all of the testimony in this case the commission

may well have concluded that the acts of misconduct charged against petitioner were those of its admitted superintendent, Scanland, who was actively supervising the job in question, who made frequent tours of inspection, and who was familiar with the safety order, who knew that it was not being observed, who thought that the order applied only to loads transported over a public highway, and who failed in his responsibility of requiring strict compliance with it as to loads being moved on private property, he having admitted that some loads were not chained or otherwise secured against displacement.

For the reasons above stated, the award is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Traynor, J., and Schauer, J., concurred.