[S. F. No. 18616. In Bank. Apr. 14, 1953.]

HAWAIIAN PINEAPPLE COMPANY, LTD. (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and KENNETH CHURCHILL, Respondents.

Brobeck, Phleger & Harrison and Rinaldo Sciaroni, Jr., for Petitioner.

Edmund J. Thomas, Jr., Leonard M. Levy, Alvin L. Dove, Johnson, Morgan, Thorne, Speed & Bamford and Robert Morgan for Respondents.

SHENK, J.—This is a proceeding in review to annul an award by the Industrial Accident Commission of additional compensation to Kenneth Churchill, an employee of the petitioner, pursuant to the provisions of Labor Code, section 4553. An award of normal compensation is not contested. The award of $15 per week additional compensation was based upon a finding that an industrial injury suffered by the employee was caused by the "serious and wilful misconduct" of the employer.

The employee operated a fork lift truck at the employer's cannery in San Jose. Switch tracks used by the Southern

Pacific Company ran between the plant and an associated warehouse, making it necessary for lift drivers when returning from the warehouse to drive out of a doorway in the warehouse down a short ramp, across two sets of switch tracks, up a short ramp and through a doorway into the main plant. A third set of tracks, used to "spot" freight cars alongside the warehouse, lay between the switch tracks and the warehouse but did not extend through the ramp, being blocked off on both sides of the ramp.

At noon in May, 1950, the employee Churchill drove out of the warehouse doorway onto the ramp as a switch engine approached on his right. He did not stop his truck. Manually operated blinker lights over the doorway had not been turned on. The employee testified that he looked into a mirror reflecting a view of the tracks but that he could see only as far as the second of two boxcars which were spotted alongside the warehouse wall adjacent to the ramp on his right, and that the switch tracks were clear as far as he could see. There was evidence also that the boxcars shut off the view by the train crew of the fork lift truck coming out of the doorway until it was practically on the track and about 11 feet from the engine. The employee testified that he too first became aware of the engine at this point; that he speeded his motor to get across the tracks ahead of the engine, but his truck was struck in the back end and upset, causing the injuries for which the contested award was made.

Prior to and on the day of the accident there were approximately 15 fork lift trucks in operation throughout the plant. Four of these trucks were continuously making crossings between the warehouse and the main plant. The injured employee testified that he alone had made between 20 and 50 crossings the morning of the accident. There was evidence that the switching engine passed the crossing on an average of four times a day during the period immediately prior to the accident.

The employer had taken precautions to prevent the occurrence of accidents at the crossing. Over the middle of each doorway there was placed a sign with crossed white lines and the letters "R R" on them. In addition stop signs were posted at each doorway. Prior to the accident and following a near accident to another lift truck driver a mirror 17 by 21 inches in size was installed on the wall of the main plant opposite the doorway in the warehouse and approximately 50 feet distant therefrom, and placed in such a position that

it reflected a view of the switch tracks to a fork lift driver leaving the warehouse. There was evidence that the view down the tracks afforded by the mirror was limited in some instances to no more than 20 feet, depending on the position at which one left the warehouse doorway.

It was conceded that the employer had an "energetic safety program" and that the employer's safety committee had been instrumental in promulgating various safety rules, including one which required that fork lift operators stop their trucks before crossing the tracks. The drivers, including the injured employee, had been furnished copies of the safety rules and had occasionally been warned of the failure of drivers to stop at the crossing or of driving their trucks at top speed which varied from three to five miles per hour. However, there was evidence that for an indefinite period immediately prior to the accident the drivers had not complied with the rule requiring them to stop, despite the warnings. Their failure to comply with the warnings was attributed by the drivers to the fact that their work load, even in the slack season, required that they hurry.

In accordance with a recommendation of the employer's safety committee made in 1947 or 1948, the employer had placed a watchman at the crossing during the so-called "operating season" at the plant, July through October of each year. The watchman acted as a lookout and gave a warning of approaching trains. One of his duties was to pull a manually operated switch which started blinker stop lights above the doorways when a train was coming. During the slack season when the accident occurred no watchman was employed, and no one was assigned the duty of sounding an alarm of an approaching switch engine. There was evidence that during the slack season the blinker lights were either not operated when a switch engine approached, or were operated by "anybody who happened to come along."

Although an approaching engine on all occasions rang a bell, the fork lift operators could not clearly hear it because the motor directly below the seat on the fork lift was noisy. The crew of the switch engine did not provide a flagman nor at any time did a member of the crew operate the manually controlled blinker lights in the doorways.

The injured employee filed a claim before the commission wherein additional compensation was sought under section 4553 of the Labor Code. That section provides that the amount of compensation otherwise recoverable shall be in-

creased one-half where the employee was injured by reason of the "serious and wilful misconduct" of his employer. The commission found that the employer "failed or omitted to provide and maintain proper and adequate safety devices to warn of the approach of switch engines along said railroad right of way or to adopt and use means, methods, operations and processes reasonably adequate to render applicant's employment and place of employment safe. . . ." It was determined that the injury to the employee "was caused by the misconduct of the employer" and that the misconduct was "serious and wilful." The referee had found on the same facts that the injury was caused by the applicant's own "careless disregard of the hazard of the right of way crossing" and that the conduct of the employer did not "constitute a reckless disregard of the safety of others and a willingness to inflict the injury complained of," citing *E. Clemens Horst Co. v. Industrial Acc. Com.*, 184 Cal. 180 [193 P. 105, 16 A.L.R. 611]. ■ However, it is for the commission, not the referee, to make the findings. (Lab. Code, § 5953; *Liberty Mutual Ins. Co. v. Industrial Acc. Com.*, 33 Cal.2d 89, 92 [199 P.2d 302].) The questions presented relate to the sufficiency of the evidence to support the findings of the commission and to the conclusions of the commission as to serious and wilful misconduct.

In support of the commission's findings there was substantial evidence that the fork lift drivers crossed the tracks scores of times a day; that the fact that they failed to make the required stop at each crossing was condoned by the employer and made necessary by the work load; that both the view of the drivers and that of the railroad crew were limited by the location of the tracks with respect to the doorways and the spotting of freight cars near the doorways; that the size of the mirror together with the distances involved did not give a clear view of the tracks for a sufficiently safe distance; that during the slack season the blinker light was unreliable, and served as much as a trap as it did as a protection, for the reason that it was operated only by the chance of someone's being present when a train approached; that the danger to which the fork lift drivers were exposed could have been eliminated, as it was in the "operating season" by the use of a watchman, or by automatic signal, and that the employer had been so informed by one of the drivers following a near accident of the same nature as the one here involved.

The commission was called upon to apply to its findings of fact a recognized standard of conduct in order that it could further find whether the employer had failed to maintain that standard. Although this inquiry involves questions of fact, the standard itself is a matter of law. The statute defines the standard as one which requires an employer to abstain from "serious and wilful misconduct," which expression has often been the subject of judicial interpretation by our courts. In our recent decision, *Mercer-Fraser Co.* v. *Industrial Acc. Com., ante,* p. 102 [251 P.2d 955], this problem was considered at length. ■ It was held that "serious and wilful misconduct" denotes a greater degree of culpability than mere negligent or even grossly negligent conduct. It was pointed out that the additional award was actually in the nature of a penalty; that it cannot be insured against; and that its imposition upon evidence of conduct any less culpable than that specified by the statute would constitute an unlawful taking of the property of one person for the benefit of another. In arriving at the legislative intent in phrasing the statute other decisions were considered which had attached meanings to the following similar terms, many employing the element of wilfulness: "wilful and wanton negligence," "wilful negligence," "wanton and wilful misconduct," "wanton and reckless misconduct," "wilful misconduct" all as used in tort actions (*Donnelly* v. *Southern Pac. Co.* (1941), 18 Cal.2d 863, 869 [118 P.2d 465]); "wilful misconduct" as used in the so-called guest statute, Vehicle Code, section 403 (*Porter* v. *Hofman* (1938), 12 Cal.2d 445, 447 [85 P.2d 447]; *Meek* v. *Fowler* (1935), 3 Cal.2d 420, 425 [45 P.2d 194]; *Howard* v. *Howard* (1933), 132 Cal.App. 124 [22 P.2d 279]). ■ These cases all held that where conduct was described as "wilful" as opposed to negligent conduct in any degree, it involves at least an intention to perform an act or omission with actual knowledge, or that which in law is deemed to be the equivalent of actual knowledge of the peril to be apprehended from the act or omission. ■ While gross negligence may involve an intent to perform the act or omission, wilful misconduct involves the further intent that the performance be harmful or that it be done with a positive, active and absolute disregard of the consequences. (*Meek* v. *Fowler* (1935), *supra,* 3 Cal.2d 420, 425-426.) ■ It was concluded in the Mercer-Fraser case that "serious and wilful misconduct" as that expression is used in section 4553 of the Labor Code

"cannot be established by showing acts any less culpable, any less deliberate, or any less knowing or intentional, than is required to prove wilful misconduct." ▮ It was stated in that case that "the true rule is that serious and wilful misconduct is basically the antithesis of negligence, and that the two types of behavior are mutually exclusive; an act which is merely negligent and consequently devoid of either an intention to do harm or of knowledge or appreciation of the fact that danger is likely to result therefrom cannot at the same time constitute wilful misconduct. . . ."

In the present case it must be determined whether the commission has applied the standard set forth in the Mercer-Fraser case in determining that the employer's misconduct was "serious and wilful." It was held in that case that the findings with regard to the conduct of the employer constituted nothing more than findings of negligence. ▮ The same is manifestly true with regard to the findings in the present case previously set out to the effect that the employer failed to "provide and maintain proper and adequate safety devices" or to employ means "reasonably adequate to render applicant's employment and place of employment safe." ▮ However, further findings to the effect that this conduct "evinced a reckless disregard for the safety of said employee" and that the employer "knew or should have known had he put his mind to it that such failure or omission was likely to result in serious injury" more closely approach those factual elements necessary to determine that the employer's misconduct was "serious and wilful." Nevertheless, as stated, the conduct must be with knowledge of the peril to be apprehended, or done with a positive and active disregard of the consequences. ▮ A "reckless disregard" of the safety of employees is not sufficient in itself unless the evidence shows that the disregard was more culpable than a careless or even a grossly careless omission or act. It must be an affirmative and knowing disregard of the consequences. ▮ Likewise, a finding that the "employer knew or should have known had he put his mind to it" does not constitute a finding that the employer had that degree of knowledge of the consequences of his act that would make his conduct wilful. The standard requires an act or omission to which the employer *has* "put his mind." (*Mercer-Fraser Co.* v. *Industrial Acc. Com., supra, ante,* pp. 102, 124.) The evidence and the findings of the com-

mission do not show that the employer had the knowledge of the consequences of its act or omission necessary to make the performance of that act or omission a wilful one.

In considering the findings of the commission as a whole and in the light of the fact that the only relevancy individual findings have to the issues presented in the present case is in regard to whether the employer is liable for *additional* compensation, it is apparent that the commission has imposed upon the employer a standard much stricter than that authorized by law. Because the specific findings of the commission fall short of what was defined as serious and wilful misconduct in the Mercer-Fraser case it must be concluded that the commission was in error in regard to the proper standard.

It is significant that the statute works both ways—hence the importance of correctly defining its terms. While section 4553 provides for an additional one-half of the normal compensation where the employer's "serious and wilful misconduct" causes the injury, section 4551 provides that "Where the injury is caused by the serious and wilful misconduct of the injured employee, the compensation otherwise recoverable therefor shall be reduced one-half. . . ." The words "serious and wilful misconduct" must be given the same meaning in each section. (*Parkhurst* v. *Industrial Acc. Com.* (1942), 20 Cal.2d 826, 831 [129 P.2d 113]; *E. Clemens Horst Co.* v. *Industrial Acc. Com.* (1920), *supra,* 184 Cal. 180, 188.) It was suggested in the Mercer-Fraser case that in determining whether an employer's misconduct would justify increasing an award it would be significant to determine first whether that same misconduct would justify reducing an award made to the one responsible for the misconduct were he the injured party.

 We are not unmindful of the rule requiring that findings be interpreted liberally in favor of sustaining an award, even where reference to the record is required. Looking at the record it is devoid of any substantial evidence that the employer intended to do harm, or that it had actual knowledge of the probable consequences of its failure to provide more adequate safety devices or a safer place to work or that it exercised an affirmative and knowing disregard for the safety of the injured employee. There is evidence that a similar accident was closely avoided shortly before the injury here complained of. It is true that at

least a constructive knowledge could have been imputed to the employer at that time that such an accident might occur again. However, the employer thereafter took steps to remove this hazard. There is· no evidence that the employer had knowledge of any kind that this remedy was inadequate, nor does the record reveal that there was any reason for it to believe that the circumstances which nearly caused a first accident continued to exist.

The present action does not involve the employer's violation of an express statute or commission safety order designed to protect employees. The rules laid down in such cases (see *Bethlehem Steel Co.* v. *Industrial Acc. Com.,* 23 Cal.2d 659 [145 P.2d 583] ; *Parkhurst* v. *Industrial Acc. Com., supra,·*20 Cal.2d 826; *Blue Diamond Plaster Co.* v. *Industrial Acc. Com.,* 188 Cal. 403 [205 P. 678]) as to what constitutes ''serious and wilful misconduct'' therefore have no application.

The award of additional compensation is annulled.

Gibson, C. J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

By its decision here the majority has completed the reactionary process, commenced by its decision in *California Shipbuilding Corp.* v. *Industrial Acc. Com.,* 31 Cal.2d 278 [188 P.2d 32], and carried forward by its decisions in *Mercer-Fraser Co.* v. *Industrial Acc. Com., ante,* p. 102 [251 P.2d 955] and *Sutter Butte Canal Co.* v. *Industrial Acc. Com., ante,* p. 139 [251 P.2d 975], of judicial repeal of the workmen's compensation law that an award shall be increased for wilful misconduct of the employer. (Lab. Code, § 4553.) I reiterate what I said in my dissents in those cases. The lethal blow has now been struck and section 4553 of the Labor Code has been nullified and stricken from the statute book by judicial interpretation. By these decisions this court has blotted out four decades of progress in the field of social legislation for the benefit of the working men and women of this state, and overruled numerous decisions of this court and the District Court of Appeal without even mentioning them.

The majority opinion holds that neither the findings nor the evidence establishes serious and wilful misconduct.

With reference to the findings, they are clearly sufficient under the authorities cited in my dissent in *Mercer-Fraser Co.* v. *Industrial Acc. Com., supra, ante,* p. 129. They expressly state that the general superintendent of the employer *knew* that his failure to provide safety devices was likely to result in serious injury. While it is also found that he should have had that knowledge, that in no way detracts from the finding of actual knowledge.

Briefly, the facts are that the employer maintained an extremely dangerous condition of its property, that is, a railway crossing which must be crossed by its employees, and had taken no steps to protect the employees against that peril. I say it took no steps because the evidence shows that the steps it did take were so completely ineffectual as to be no protection whatsoever. Moreover, one of the steps taken, the presence of the signal light to warn of an approaching train, went beyond being ineffectual; it operated as a pitfall and trap for the employees inasmuch as it was operated sometimes and not others. All these conditions the employer knew of, yet it did nothing to correct them.

A witness, Amaro, testified that three days before the applicant employee was injured, he was engaged in the same work, and while driving a lift truck across the railroad tracks, barely escaped being struck by a train. He told Spiegel, the employer's representative in charge, of his near injury and that the signal light should be fixed so as to turn on automatically when a train was approaching because "you couldn't see the train when you came out of the door" to cross the tracks, that is, in effect, that *none* of the employer's devices served to safeguard against the peril; that a watchman or flagman should be put on the crossing. A mirror was placed by the employer at the door the same day of Amaro's near injury purportedly to give an operator of the lift truck a view of approaching trains but it only gave a view 20 feet down the tracks. He saw the employer's superintendent at the crossing after the signal lights were installed and it may be inferred that the latter knew that they operated only sporadically when someone happened to operate them. It was not customary for the truck drivers to stop at the crossing because their work load was heavy. This was also known to the superintendent.

A representative of the employer testified he knew there was a train operating on the crossing at the time of the accident and that no one was operating the stop lights.

Summarizing, the evidence shows that there was here a very dangerous railroad crossing that must be continually traversed by the employees. Its danger was apparent to anyone from a view of the physical facts. The employer knew of that danger prior to the accident because it had placed lights to signal the approach of a train and had a man to operate them during the busier times and because its superintendent was specifically advised by an employee, who had a "close call," of the danger and that none of the devices gave effective protection. In the face of that knowledge the employer failed to do anything about it—permitted its employees to bear the risk of this very real hazard. Certainly it is wholly reasonable to draw an inference that its conduct was in reckless disregard of its employees' welfare. Indeed, its conduct amounts to intentionally subjecting its employees to injury, and this condition was permitted to exist solely because protection would cost the employer money. In the face of the foregoing facts which the record discloses without contradiction, the majority opinion states: "The evidence and the findings of the commission do not show that the employer had the knowledge of the consequences of its act or omission necessary to make the performance of that act or omission a wilful one. . . . Looking at the record it is devoid of any substantial evidence that the employer intended to do harm, or that it had actual knowledge of the probable consequences of its failure to provide more adequate safety devices or a safer place to work or that it exercised an affirmative and knowing disregard for the safety of the injured employee." I cannot reconcile the foregoing statements with an honest analysis of the record in this case. It is undisputed that during the so-called busy season, the employer maintained a watchman at the crossing to guard against such accidents as the one here involved. The employer, therefore, knew that the crossing was a dangerous one and that safety measures must be taken to guard against accidents of this character. The only satisfactory safety measure which had been employed was the maintenance of a watchman or an employee to manually operate the blinker lights. This safety measure was abandoned by the employer during the nonbusy season although the risk was just as great to the employee during the nonbusy season as during the busy season. In the face of this factual background may it be said with the slightest regard for the truth, that "The evidence and the findings of the commission do not show that the employer had the knowledge of the consequences of its act or

omission necessary to make the performance of that act or omission a wilful one,'' or that ''the record is devoid of any substantial evidence that the employer . . . had actual knowledge of the probable consequences of its failure to provide more adequate safety devices or a safer place to work or that it exercised an affirmative and knowing disregard for the safety of the injured employee.''

I am constrained to repeat a statement hereinabove made, that the only reason this hazardous condition was permitted to exist was solely because the maintenance of an adequate safety measure would cost the employer money. The Legislature by its enactment of section 4553 of the Labor Code sought to correct this evil, but the majority of this court, solicitous only of the financial welfare of the employer, says no, it is too great a burden for the employer to bear. So we are back where we were 40 years ago so far as the enforcement of safety regulations is concerned.

It is the old story of the will of the people and the Legislature being defeated by reactionary court decisions. To protect employees against unnecessary risks, the Legislature enacts a law providing that an employer must provide a safe place for his employees to perform their work, and that failure to do so constitutes wilful misconduct on the part of the employer entitling an employee injured thereby to an increased award of compensation. Obviously such a law tends to create increased vigilance on the part of employers to provide safety devices and thus reduce the number of industrial injuries. There can be no doubt that the present law has had a salutary effect. Its nullification by this court is not only a travesty on social justice but an insidious abuse of judicial power.

I would affirm the award here made.

Respondents' petition for a rehearing was denied May 7, 1953. Carter, J., was of the opinion that the petition should be granted.