[Civ. No. 10782. Third Dist. Nov. 5, 1965.]

GRASON ELECTRIC COMPANY, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, RUTH E. LAUER et al., Respondents.

T. Groezinger, Loton Wells, Patrick R. Maloney, Schaber & Cecchettini, Raymond M. Farley, Sheldon H. Grossfeld and William S. Gregory for Petitioner.

Everett A. Corten, Charles Decker and Douglas Busath for Respondents.

FRIEDMAN, J.—Grason Electric Company was the employer of John Lauer, who was fatally electrocuted in the course of his work. The Industrial Accident Commission held that the employer had been guilty of serious and wilful misconduct and awarded the widow augmented compensation. The employer petitioned for review.

Labor Code section 4553 provides for an increase of workmen's compensation where the employee is injured by reason of the serious and wilful misconduct of the employer or his managing representative. Serious and wilful misconduct is not to be equated with negligence or even gross negligence. In *Mercer-Fraser Co.* v. *Industrial Acc. Com.*, 40 Cal. 2d 102, 120 [251 P.2d 955], it was authoritatively defined as ''an act deliberately done for the express purpose of injuring another, or intentionally performed either with knowledge that serious injury is a probable result or with a positive, active, wanton, reckless and absolute disregard of its possibly damaging consequences . . . .'' As this court interpreted the *Mercer-Fraser* definition in *Dowden* v. *Industrial Acc. Com.*, 223 Cal.App.2d 124, at page 130 [35 Cal.Rptr. 541], serious and wilful misconduct includes these three alternatives: (a) a deliberate act for the purpose of injuring another; (b) an intentional act with knowledge that serious injury is a probable result; or (c) an intentional act with a positive and reckless disregard of its possible consequences.

The facts are undisputed. Grason had a contract to erect street lighting standards according to plans made by project engineers who were not employees of Grason. The employees actually doing the work were Bruce Mayers, the foreman, John Lauer, the decedent, and Werner Schoenhoff. Approximately two weeks before the accident, Mayers called his superior, Richard Carlson, president and general manager of Grason Electric, and informed him that if the plans were followed, one standard would be located between two high-voltage lines which were only 4 feet apart. Each of these lines carried 7,000 volts of electricity. Carlson told Mayers to stop work on that standard and to continue erecting other standards pending further orders. Carlson then contacted the project engineer. A study of the situation was made and as a result the base for the standard was located 10 feet 4 inches south of the original location. At this point the high-tension lines ran east and west, the street north and south. When placed at the new location, the top of the standard would be approximately at the level of the lines and about 8½ feet distant. A 6-foot extension arm holding the lighting fixture and fastened to the pole at its top would be parallel to the lines.

After the base was installed at the new location and the crew were ready to raise the standard and bolt it to its base, they placed it on the ground, approximately parallel to the lines, with its arm pointing south and away. Its lower end

was close to the base. A winch truck with a 20-foot rear-mounted boom was positioned under the wires to raise the standard, but the foreman, Mayers, determined that hoisting the standard with the truck in that location could be dangerous. Accordingly, he moved the truck so that it was south of the base, standing at a 45-degree angle to it, with its boom approximately over the base. The hoisting cable of the truck was attached to the lighting standard by a knotted rope, placed 17 or 18 feet up the pole, which thus became "bottom heavy." When raised, the standard would be nearly perpendicular over the base and could be hand-managed so that holes in its bottom flange would be in position to receive the base bolts.

After the standard had been roped to the cable, Lauer took hold of the standard a few feet from the lower end. Mayers went to the other end where the arm was located. The pole was lifted up high enough so that the arm swung free and pointed down. Mayers then joined Lauer in manipulating the base end and the lifting continued. When the standard had been raised to a nearly perpendicular position, the arm then pointing south, Lauer and Mayers proceeded to rotate the standard so that it could be bolted to the base with the arm parallel to the lines. Both men were managing the standard, both had hold of it, and as they rotated it something (no one knew what) caused it to rotate beyond the point where the arm came parallel to the power lines. It came into contact with the lines, or came so near to them that the current arced to the standard. Lauer was fatally electrocuted. Mayers was stunned but otherwise uninjured.

Mayers testified that he had erected five or six hundred standards in the manner above described; that once the standard was lifted and the cinch knot of the rope tightened it was his experience that the standard would not twist. He believed that throughout the operation the standard could be and would be kept out of dangerous proximity to the lines. That was also the opinion of Carlson who, after the location had been changed, considered the standard could be erected without danger by the method being used. Charles Kleinwachter, a safety representative with the State Compensation Insurance Fund, investigated the accident immediately after it occurred. He testified that he would not have stopped the operation had he been present while the work was being done, in effect, that he considered the method used to be a safe method.

Mayers, the foreman, was familiar with Industrial Safety Order No. 2603 of the State Department of Industrial Relations (Cal. Adm. Code, tit. 8, § 2603) prohibiting work within 6 feet of high-voltage lines except under prescribed conditions.[1] So was Richard Carlson, the president and general manager.

In 1959 the Legislature adopted Labor Code section 4553.1 dealing with awards for serious and wilful misconduct based upon violations of safety orders.[2] Before the enactment of

---

[1]The safety order declares:

"(a) General Provisions. No person, firm, or corporation, or agent of same, shall require or permit any employee to perform any function in proximity to high-voltage lines; . . . or to erect, install, operate, or store in or upon such premises any tools, machinery, equipment, materials, or structures . . . unless and until danger from accidental contact with said high-voltage lines has been effectively guarded against in the manner hereinafter prescribed.

"   .       .    .    .    .    .    .    .    .    .    .    .

"(b) Clearance of Safeguards Required. The operation, erection or transportation of any tools, machinery, or equipment, or any part thereof capable of vertical, lateral, or swinging motion; the handling, transportation, or storage of any supplies, materials or apparatus; . . . over, by or near high-voltage lines, is hereby expressly prohibited, if at any time during such operation, transportation or other manipulation it is possible to bring such equipment, tools, materials, building or any part thereof within six feet of such high-voltage lines. Except, however, that when such high-voltage lines have been effectively guarded against danger from accidental contact, either by:

"(1) The erection of mechanical barriers to prevent physical contact with high-voltage conductors;

"(2) De-energizing of the high-voltage conductors and grounding where necessary;

"(3) Removal of the high-voltage conductors; then, and only then, may the six-foot clearance above mentioned be reduced. . . .

"(c) Warning Sign Required. The owner, agent, or employer responsible for the operations [sic] of equipment, shall post and maintain in plain view of the operator of each crane, derrick, power-shovel, drilling-rig, hay loader, hay stacker, pile-driver, or similar apparatus, any part of which is capable of vertical, lateral or swinging motion a durable warning sign legible at 12 feet reading: 'Unlawful to Operate This Equipment Within 6 Feet of High-Voltage Lines.'

"(d) Notification to Power Company and Responsibility for Safeguards. When any operations are to be performed, tools or materials handled, or equipment is to be moved or operated within six feet of any high-voltage line, the person or persons responsible for the work to be done shall promptly notify the operator of the high-voltage line of the work to be performed and shall be responsible for the completion of the safety measures, as required by Order 2603 (a) and (b) before proceeding with any work which would impair the aforesaid clearance."

[2]Labor Code, section 4553.1, provides: "In order to support a holding of serious and willful misconduct by an employer based upon violation of a safety order, the commission [appeals board] must specifically find:

"(1) That the safety order was established as having been known to

section 4553.1, the employer could be charged with constructive knowledge of a safety statute or safety order (*Parkhurst* v. *Industrial Acc. Com.*, 20 Cal.2d 826, 830 [129 P.2d 113].) With the adoption of section 4553.1, actual knowledge became a requisite. (See *Dowden* v. *Industrial Acc. Com.*, *supra*, 223 Cal.App.2d at pp. 128-129; see also, Comment, 42 Cal.L.Rev. 852, 860-861.) Additionally, section 4553.1 specifies various findings which must be made when serious and wilful misconduct is premised upon violation of a safety order. Except for the matter of actual versus constructive knowledge, section 4553.1 did not disturb judicially established standards of serious and wilful misconduct.[3]

Since, in the present case, both the general manager and the foreman admitted actual knowledge of the safety order, the change made by section 4553.1 is not a pivotal factor. The commission specifically found: ''That the employer did not erect barriers or de-energize high tension electric power lines in the immediate area where decedent was required to work as required by Eelctrical Safety Order No. 2603.''

Before 1953, when *Mercer-Fraser Co.* v. *Industrial Acc. Com.*, *supra*, was decided, the role of safety statutes and industrial safety orders in serious and wilful misconduct cases had been fairly well delineated. The employer's failure to comply with a safety statute or order was not serious and wilful misconduct, either *per se* or presumptively; rather, the nature of the regulation and the circumstances of the accident would determine whether or not the employer's actions should be characterized as serious and wilful misconduct.

---

a particular identified and named person or persons, either the employer or a representative of the employer designated by Section 4553;

'' (2) That the violation was established to have been committed by a particular identified and named person or persons, either the employer or a representative of the employer designated by Section 4553;

'' (3) That the condition making the safety order applicable at the time of the injury or death was established to have been known to a particular identified and named person or persons, either the employer or a representative of the employer designated by Section 4553;

'' (4) The specific manner in which the order was violated; and

'' (5) That the violation of such safety order did proximately cause the injury or death, and the specific manner in which the violation constituted such proximate cause.''

[3]In *Wolters* v. *Industrial Acc. Com.*, 233 Cal.App.2d 136, at page 143 [35 Cal.Rptr. 549], we voiced a dictum permitting the implication that Industrial Accident Commission findings complying with section 4553.1 are an adequate basis for the award without the necessity of proof that the employer has been guilty of conduct conforming to the judicial definition of serious and wilful misconduct. The dictum was careless and we do not now agree with it.

(*Bethlehem Steel Co.* v. *Industrial Acc. Com.*, 23 Cal.2d 659, 662-664 [145 P.2d 583] (safety order) ; *Parkhurst* v. *Industrial Acc. Com., supra,* 20 Cal.2d at p. 830 (safety statute) ; *Ethel D. Co.* v. *Industrial Acc. Com.,* 219 Cal. 699, 704 [28 P.2d 919] (safety order).) *Hoffman* v. *Department of Industrial Relations,* 209 Cal. 383, 390 [287 P. 974, 68 A.L.R. 294], states : ''It will be conceded that the violation of one statute may be far more serious than the violation of another statute ; and that the violation of the same statute under one set of facts may not be serious, whereas under a different set of facts it will be quite serious indeed.''

The *Mercer-Fraser* decision made no apparent change in the role of safety regulations as a factor of serious and wilful misconduct. It dealt with the other circumstances of the accident, principally the employer's conduct, making it plain that the judicial concept of serious and wilful misconduct would require a greater degree of deliberation and a more complete recognition of danger than had been supposed (see also *Keeley* v. *Industrial Acc. Com.,* 55 Cal.2d 261, 268 [10 Cal.Rptr. 636, 359 P.2d 34] ; *Hawaiian Pineapple Co.* v. *Industrial Acc. Com.,* 40 Cal.2d 656, 663 [255 P.2d 431]). Violation of a safety regulation, as a factor in the accident, would continue to play a role varying with the nature of the regulation.

■ The violation of a known safety regulation as a determinative factor inevitably affects appraisal of the remaining circumstances. As the *Hoffman* case states, violation of one safety regulation may be far more serious than violation of another. Safety regulations deal with different degrees of peril. A safety order or statute as a factor indicating serious and wilful misconduct increases in force with the intensity of the peril with which it deals. The remaining circumstances, principally the employer's conduct, comprise the other factor. ■ The general concept of serious and wilful misconduct denotes a minimum level of conduct on the employer's part. When his conduct falls below that level, the penalty award ensues. If this minimum level of employer conduct is viewed as a constant factor, variations in the critical character of the safety regulation will have no significance at all. ■ The minimum level of care demanded of the employer must be somewhat elevated in the presence of known safety regulations dealing with progressively acute hazards. The demand for compliance grows more imperious as the peril intensifies. The employer who ignores a regulation

against roller towels in the washroom may be merely negligent. The same inattention to a regulation dealing with lethal danger may amount to serious and wilful misconduct.

Safety Order No. 2603 does not deal with such mild occupational hazards as roller towels or common drinking cups. Its subject is deadly and immediate peril. Work in the neighborhood of high-voltage lines exposes the employee to extreme and drastic industrial danger. Death is the usual result of physical contact with a high-tension wire, directly or through a conductor. A high-voltage charge may arc across an air gap. Thus danger is present even when the conductive material does not make actual contact with the line.[4] So deadly is the danger that the Legislature has imposed a criminal sanction on movement of equipment or material within 6 feet of lines carrying more than 750 volts. (Pen. Code, § 385.)[5] The 6-foot clearance is apparently designed not only to provide a cushion of safety, but to supply an air gap against the arcing of an electrical charge. Safety Order No. 2603 expresses the same serious concern. In plain terms, it prohibits the handling of material or equipment near high-voltage lines, *if it is possible to bring* it within 6 feet of such lines. It creates an exception only if one of three safety precautions is taken. Just three, no more and no others, are specified.

The distances and angles were such that it was possible to bring the metal standard not only within 6 feet, but into actual contact, with the high-tension line during the placement operation. The foundation for the metal pole was about 8 feet 4 inches from a figurative line corresponding to the position of the nearest wire. Both the top of the pole and the height of the wire were about 25 feet above ground level. A 6-foot arm extended horizontally from the top of the pole. If during the installation the metal pole leaned somewhat from the perpendicular, or if there were a slight leaning combined with a swing of the horizontal arm, the arm would come within less than 6 feet, even into actual contact with the high-voltage line. The physical facts must have made it obvious to the foreman, as simple geometry makes it obvious now, that entry into the danger zone was *possible*. Sole

---

[4] In this case a witness testified to his examination of the aluminum light standard following the accident. At the top of the standard he saw discolorations which he believed to be ''arc burns.''

[5] The line which electrocuted John Lauer, the decedent, carried 7,000 volts.

mechanism designed to prevent this possibility was a rope and cinch knot, tied 17 or 18 feet above the base of the pole, to which the cable of the winch truck was hooked. The pole, with its 6-foot extension arm, was suspended at a single point. If the pole turned within the rope loop, if the knot slipped, it was possible to enter the 6-foot safety zone, indeed to make actual contact. Contact was possible with or without the knotted rope.

Thus subdivision (b) of Safety Order No. 2603 "expressly prohibited" the handling or manipulation. That express prohibition was subject to a rigidly narrow exception. The exception permitted the work to continue only if one of three precautionary measures were taken: mechanical barriers, de-energizing, or removal of the high-voltage conductors. As though striving for the utmost vehemence permitted to stolid officialese, the regulation declared that *then and only then* could the (possible) clearance be reduced below 6 feet. Impervious to vehemence, the foreman relied on his own experience rather than the safety order. In place of one of the three safeguards prescribed by public regulation, he substituted a safeguard of his own prescription—the knotted rope loop. Death was the result.

The safety order imposed stringencies proportionate to the danger. As loudly and powerfully as words can, it expressed an authoritative and inflexible social policy regarding this ultra-hazardous activity. The policy prohibited the employer from taking the slightest gamble with his employee's safety. The prohibition was all the more strenuous because the stakes were so high. Not freedom from injury, but life itself, was at stake.

In the face of unregulated and far less acute occupational hazards, it has been said that the "reckless disregard" ingredient of serious and wilful misconduct must be affirmative and knowing (*Hawaiian Pineapple Co.* v. *Industrial Acc. Com., supra,* 40 Cal.2d at p. 663); similarly, that the danger must be known, not one which the employer would have recognized "had he put his mind to it" (*Keeley* v. *Industrial Acc. Com., supra,* 55 Cal.2d at p. 267); and inferably, that precautions, although unsuccessful, will preclude the award (*ibid.,* p. 269). In this case the employer took some precautions, however, inadequate: first, the change in location, although this step may have been aimed as much at permanent safety as temporary safety during construction; second, the knotted rope, which had been efficacious on earlier occasions;

third, moving the winch truck. The assumption that inadequate precautions prevent the misconduct award under all circumstances rests on a fallacy: that the minimum level of employer conduct is a constant factor in the presence of safety regulations dealing with varying degrees of danger. We have seen that it is not.

That the foreman did not intend the accident, that he subjected himself to a similar degree of peril, that he believed the safeguards adequate and the risk small—these might serve as sufficient defenses in the face of unregulated conduct and less hazardous activity. Here the conduct was regulated, the regulation known and the hazard intense. Culpability lies in the foreman's decision that the activity was safe notwithstanding violation of the safety order. He took it upon himself to match his own judgment (such as it was) against the emphatic policy decreed by law and safety regulation. He deliberately took the gamble forbidden by law. The law should measure its penalty by the deliberation with which the gamble was taken, not the deliberation with which it was lost. Viewed in relation to acute danger and an inflexible legal demand, the decision was characterized by positive and reckless disregard of its possible consequences.

The award is affirmed.

Regan, J., concurred.

PIERCE, P. J.—I dissent. I adhere to my concurrence with the opinion written by Justice Van Dyke, filed February 3, 1965, reported in (Cal.App) 42 Cal.Rptr. 550. The portion of that opinion which deals with the law and which expresses my views follows:

"The commission considered that the facts showed a violation of its safety order. On this point the parties present arguments pro and con. However, we think it unnecessary to rule upon that and will assume the violation of the safety order. The violation of the safety order, like the violation of any safety statute, is prima facie proof of negligence, but it is not prima facie proof of the much graver misconduct involved in serious and wilful misconduct as those terms are used in Labor Code sections 4553 and 4553.1. What is meant by the words 'serious and wilful misconduct' as used by the Legislature has been the subject of a number of decisions by the Supreme Court and the District Courts of Appeal. Notable among these are *Mercer-Fraser Co.* v. *Industrial Acc. Com.,* 40 Cal.2d 102 [251 P.2d 955] ; *Hawaiian Pineapple Co.* v. *Industrial Acc. Com.,* 40 Cal.2d 656 [255 P.2d 431] ; *Sutter Butte Canal Co.* v.

*Industrial Acc. Com.,* 40 Cal.2d 139 [251 P.2d 975]; *Dowden* v. *Industrial Acc. Com.,* 223 Cal.App.2d 124 [35 Cal.Rptr. 541]; *Wolters* v. *Industrial Acc. Com.,* 223 Cal.App.2d 136 [35 Cal.Rptr. 549]. We quote the following from *Dowden* v. *Industrial Acc. Com., supra,* at page 130: 'In that case [Mercer-Fraser Co. v. Industrial Acc. Com., 40 Cal.2d 102 (251 P. 2d 955)] the Supreme Court rejected the notion that serious and wilful misconduct is the equivalent of negligence or even gross negligence. Serious and wilful misconduct, said the court, is "an act deliberately done for the express purpose of injuring another, or intentionally performed either with knowledge that serious injury is a probable result or with a positive, active, wanton, reckless and absolute disregard of its possibly damaging consequences. . . ." [Citation.]' Violation of a safety order cannot be equated with serious and wilful misconduct as a matter of law. (*Ethel D. Co.* v. *Industrial Acc. Com.,* 219 Cal. 699, 704 [28 P.2d 919]; *Mercer-Fraser Co.* v. *Industrial Acc. Com., supra*; *Simmons Co.* v. *Industrial Acc. Com.,* 70 Cal.App.2d 664 [161 P.2d 702].) Whenever the conduct of the employer is charged as being serious and wilful misconduct, whether that conduct involves and includes violation of a safety order or not, there must still be presented by the whole record employer conduct measuring up to the definition of serious and wilful misconduct as defined in *Mercer-Fraser.* On the whole record before us the commission's finding of serious and wilful misconduct cannot be sustained. In the last analysis it was Mayers' conduct that is decisive. He had had extensive experience in doing the very type of work here involved. He knew the danger of working in the area of high-tension electric lines. He knew the men and the equipment with which he had been engaged in the performance of his employer's contract. He immediately recognized the danger involved in erecting the light standard at its original location. He notified his employer of that danger, and when told to change the location to a point 10 feet 4 inches south of its original point, he performed the work of doing that. For greater safety he changed the positioning of the truck from where it had originally been placed for the purpose of erecting the standard to a safer place. Throughout he showed concern and care to perform the work in such a way that no part of the standard would come within dangerous proximity to the wires. As said in *Merced-Fraser Co.* v. *Industrial Acc. Com., supra,* 40 Cal.2d at pages 120-121: '[T]he very fact that he was worried would seem to negative, rather than affirm, either an intent to harm or a wanton, positive and absolute disregard

of possible harm. . . .' Here his entire conduct negatived such intent or disregard. Mayers, in following the method of operation which he did, was, of course, conscious of the fact that throughout he would be in exactly the same position so far as danger was concerned as would be decedent. Certainly, Mayers, as he testified, believed that following his proposed method the standard would be installed without danger; and since he would be subjected to injury as well as decedent if misadventure occurred, Mayers' belief in the safety of his method was held in good faith, based upon long experience with the very method itself.''

To the statement quoted I add this: The three conditions (stated above), one of which must exist before there is serious and wilful misconduct, are: (1) an act deliberately done for the express purpose of injuring another, (2) an act intentionally performed either with knowledge that serious injury is a probable result, or (3) a positive, active, *wanton,* reckless and absolute disregard of its possibly · damaging consequences. (*Merced-Fraser Co.* v. *Industrial Acc. Com., supra,* as interpreted in *Dowden* v. *Industrial Acc. Com., supra.*) Since conditions (1) and (3) cannot possibly apply here, the only condition even arguable is that here there was "an act intentionally performed . . . with knowledge that serious injury is a probable result.'' But how can we say here that there was ''knowledge that serious injury [was] a probable result''? The facts are that five or six hundred standards had been raised without mishap as this one was raised, using exactly the same methods. The safety representative of the State Compensation Insurance Fund who investigated the accident testified that the method used was safe and that had he been present while the work was being done he would not have stopped it. Thus the evidence leaves no doubt that experienced experts, empirically fortified by five or six hundred actual tests, entertained an honest and educated belief that these standards as they were rigged could not possibly be brought within 6 feet of the hot wire. They were wrong. Into their acts I can read "negligence." I simply cannot read "knowledge that serious injury [was] a probable result.'' I think the majority opinion legislates. And I also believe that it legislates in a field disruptive of the whole scheme of workmen's compensation.

A petition for a rehearing was denied November 30, 1965. Pierce, P. J., was of the opinion that the petition should be granted. Petitioner's application for a hearing by the Supreme Court was denied January 12, 1966.