[Civ. No. 12467. Third Dist. Oct. 27, 1970.]

CLARENCE F. ERICKSON, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD,
THE STATE OF CALIFORNIA et al., Respondents.

COUNSEL

Wilmer W. Morse for Petitioner.

Rupert A. Pedrin, Lionel K. Hvolboll, Alan R. Porterfield, T. Groezinger, Loton Wells, A. C. Jones and W. R. Lowndes for Respondents.

## OPINION

JANES, J.—Petitioner, Clarence F. Erickson, seeks annulment of a decision of the Workmen's Compensation Appeals Board (hereinafter, "board") after reconsideration, in which the board found it was not true that petitioner was injured by reason of serious and willful misconduct on the part of his employer (respondent State of California) or of a managing representative of the employer. The board ordered that petitioner take nothing on his claim for increased benefits.[1] We issued a writ of review.

Erickson, a rotary pressman, sustained injury to both arms and hands arising out of and occurring in the course of his employment on November 2, 1962,[2] when his hands were caught between the rollers of a rotary press

---

[1]Section 4553 of the Labor Code provides for increased compensation where the employee is injured by reason of the serious and willful misconduct of the employer.

[2]Petitioner filed his application for workmen's compensation benefits in 1963, supplementing it with an application which claimed, inter alia, violation of certain safety orders and failure by the employer to provide petitioner with a safe place to work. At that time, by reason of petitioner's physical condition, the matter was kept off calendar at the request of his counsel. The petition was heard on the normal issues in 1966;

which he was cleaning at the state printing plant. At the time of the accident, while the press was idling for "washup" with the guard removed, one of Erickson's hands was drawn into the press, and in trying to free his hand, the other hand was also caught and he was drawn farther and farther into the press. The machine continued to operate until other workmen discovered him and turned off the power.

The referee found that "[t]he injury was proximately caused by the serious and willful misconduct of the employer, in that the employer instructed and permitted [petitioner] to wash up the ink rollers of a certain rotary press while the machine was running, and without the roller guards in place." In ordering reconsideration, the board reasoned that "[t]he removal of the guard during the cleaning operation was standard procedure, and neither the plant safety committee nor any safety inspector ever made any recommendations for change." The board noted that petitioner himself testified that he did not realize the danger, and it concluded that "[t]he danger . . . was apparently not appreciated prior to the injury."

The board's key conclusion was that "[w]hile it can be said that the [general pressroom foreman, Gordon Lerch] should have realized the danger if he had put his mind to it, the evidence falls short of establishing that he had in fact put his mind to the hazard and deliberately failed to correct it."

█ In proceedings like the present one, where evidentiary support for the board's decision is challenged, this court's role is well defined. "Where, as permitted by Labor Code section 5315, the appeals board has set aside the referee's decision and made its own finding based upon independent examination of the record, the decision presented for judicial review is not that of the referee, but that of the appeals board." (*Montyk* v. *Workmen's Comp. App. Bd.* (1966) 245 Cal.App.2d 334, 335 [53 Cal.Rptr. 848].) Factual determinations of the board must be upheld if, upon examination of the entire record, there is substantial evidence in their support. (*LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432].) █ The board, however, " '*must accept as true the intended meaning of [evidence] both uncontradicted and unimpeached.*' " (*LeVesque* v. *Workmen's Comp. App. Bd., supra*, at p. 639.) (Italics ours.)

---

those issues have been adjudicated and are not involved in this proceeding. In 1969, a hearing was held before a referee of the board on the application for increased benefits based on alleged serious and willful misconduct of the employer; on June 30, 1969, the referee determined that issue in petitioner's favor. Respondent state and the State Compensation Insurance Fund petitioned the board for reconsideration and, on August 12, 1969, the board filed its Opinion and Order Granting Reconsideration and Decision after Reconsideration wherein the referee's finding of serious and willful misconduct and the award based thereon were rescinded, new findings were made, and it was ordered that petitioner take nothing on his claim for increased benefits.

The evidence here is not in material conflict and may be summarized: Before being injured, petitioner had six or seven years' experience operating the particular model press at the state plant. As general foreman, Mr. Lerch had been "top man" in the pressroom since 1952 or 1953. He was responsible for the entire pressroom and for all shifts. He supervised the maintenance of equipment, trained personnel, and established and enforced safety rules, and although not present when petitioner was injured, Lerch was familiar with the press involved in the accident and with its operation.

After every shift, the rollers were cleaned (i.e., "washed") with a spatula and solvent. While doing this, the pressman had to work very close to the rollers because he was standing on a walkway only two feet wide. Standing on the walkway and facing the unit in which Erickson was injured, the employee faced a bank of horizontal rollers, some in-running and some out-running, each approximately 7 feet long and varying in size, the smallest being 3 inches in diameter. While the pressman was squirting solvent between the rollers, it was normal to aid spread of the solvent by keeping the rollers idling; while idling for washup, the 20-inch plate cylinder turned at the rate of about 1,800 to 2,000 revolutions (or impressions) per hour, the 3-inch roller at about 220 revolutions per minute. This was approximately half their speed when printing.

Although it was not necessary for the pressman to put his hands into the rollers to wash them, once the ink had been removed from the rollers they had, as Mr. Lerch testified, "a grip on them just like a ringer [sic]" and even at very low speeds the press "would hang on to you." The foreman admitted that the press would be dangerous even when it was inked up.

The press had a guard with a mesh screen. The guard was kept in place while the rollers were printing. During the washdown, it was a long-established state printing plant and industry practice to take off the guard; Mr. Lerch considered that practice to be normal. An instructor from the factory which manufactured the press had removed the guard when showing Mr. Lerch how to wash the rollers. It would have been possible to squirt on the solvent without removing the guard, and the spatula and a drip pan could have been cleaned with the press stopped, but the washdown was faster, easier, and less messy if the guard was removed.

The roller speed during washup was rapid enough that a man working there had to be very careful where he put his hands. Mr. Lerch testified that when a press was running at *printing* speed it would be "very dangerous" for a man to operate it with the guard off, and he acknowledged that as the speed dropped down to zero "the danger becomes less and less. . . ." When asked whether it was *"obviously dangerous* for men to work about the rotary press at *any* speed" with the guard removed, he answered, *"It in-*

*creases the danger."* (Italics ours.) Mr. Lerch further testified that he had given general instructions that guards were to be in place when the presses were *printing,* and that he had maintained signs on the machinery which cautioned as follows: "You are *not* to clean, oil, adjust or repair any machinery *while it is in motion. Replace all safety guards.* This is an order to you!" (Italics in original.) He stated that these signs were maintained because he felt that someone, sometime would be injured if employees cleaned, oiled, or repaired the machinery while it was in operation. Uncontradicted evidence was to the effect that the pressroom personnel did not think the signs applied to the washup.

Mr. Lerch was familiar with the washup process; knew that it was done with the guard removed; knew that in the process the pressmen worked before the exposed bank of rollers; knew that it was dangerous to have the guards down with the press running; warned the men from time to time to be careful; and recognized that the workmen did not have any protection against being drawn into the rollers by accident. He recalled that prior to the Erickson accident another employee had caught his finger in the press while it was running at a slow speed. Although he first testified that it was not possible to wash the presses with the guards in place, he later admitted that it would be possible to do the job with them on.

Mr. Eldredge, a safety engineer called by the employer, was formerly supervising safety engineer for the State Compensation Insurance Fund and visited the state printing plant almost monthly in the years preceding Erickson's accident; he was familiar with the presses and the washup procedure. He confirmed that it was an industry-wide practice to remove the guard during cleaning of a press, and he himself deemed it an acceptable procedure. In response to a question whether the washup procedure was such that the nature of the work, the type of machinery or the size and shape of material being worked prevented the press from being guarded, he stated that the washup "was a problem which was accepted as a hazard," but his opinion was that it could be safely accomplished with a modification or shortening of the guard in existence at the time of Erickson's injury. He was aware of no recommendations made by the plant's safety committee or other persons for a change of washup procedures; there was testimony by other witnesses that neither the plant safety committee nor any safety inspector ever recommended that the procedure be changed.

█ Our review of the record, as above summarized, persuades us that the board erred in the key conclusion here under attack. The board went no further than to concede a possibility that Mr. Lerch "should have realized" the danger in permitting cleanup operations with the guard removed. It found that the evidence fell short of establishing that Lerch had

put his mind to the hazard and deliberately failed to correct it. We disagree. The board's conclusion is unsupported by substantial evidence. The plain meaning of the uncontradicted evidence (*LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d at p. 639) is that Mr. Lerch, the pressroom foreman, took a calculated risk with petitioner's safety for the sake of convenience.

██ Where a dangerous situation exists and the employer knows of the danger and turns his mind to the fact that injury to his employees will probably result if he fails to take appropriate precautions for their safety, he is guilty of serious and willful misconduct. (*Rogers Materials Co.* v. *Ind. Acc. Com.* (1965) 63 Cal.2d 717, 723-724 [48 Cal.Rptr. 129, 408 P.2d 737].)

The facts in the case before us are remarkably like those in *Rogers,* where the court stated that a finding that an employer is guilty of willful misconduct "may be based on evidence that he deliberately failed to act for the safety of his employees, knowing that his failure would probably result in injury to them." (*Id.,* p. 722.) Continuing, the court pointed out that "an employer commits wilful misconduct when he 'turns his mind' to the fact that injury to his employees will probably result from his acts or omissions, but he nevertheless deliberately fails to take appropriate precautions for their safety." (*Id.,* p. 723.)

The state seeks to escape culpability on the grounds that the manufacturer taught the cleaning process used; that it was an industry-wide practice to remove the safety guards during washup; that neither the pressmen nor their union ever reported the unguarded washup procedure as an unsafe practice; and that neither the state's safety engineers nor the plant's safety committee made any suggestions or recommendations for change in the procedure.

The contention lacks merit. It is of no moment that others were unaware of the danger. The evidence shows, as we have pointed out, that the danger here was obvious to the employer. ██ The employer may not defer taking preventative steps to avoid injury to his employees from known danger merely because others in the industry so decline or because safety personnel have made no recommendation thereon. The existence of an industry-wide practice or the recommendations of safety personnel are of no significance where the employer, independently, has turned his mind to the danger and recognizes the probability of injury. (See, *LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d at pp. 638-639, fn. 22; *White* v. *Workmen's Comp. App. Bd.* (1968) 265 Cal.App.2d 115, 125 [71 Cal.Rptr. 49].)

Our conclusion renders it unnecessary to discuss petitioner's further con-

tentions that his employer's serious and willful misconduct was also established by evidence of violation of certain safety orders as well as by testimony concerning the welding of a "shear pin" with which the rotary press was equipped.

The decision of the Workmen's Compensation Appeals Board is annulled, and the cause is remanded to the board for proceedings consistent with the views expressed herein.

Pierce, P. J., and Friedman, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied December 23, 1970.