[No. A127136. First Dist., Div. One. Oct. 4, 2010.]

BIGGE CRANE AND RIGGING CO., Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and PAUL HUNT,
Respondents.

1332

1334

## Counsel

Robert D. Peterson and Robert D. Peterson for Petitioner.

Atkinson, Andelson, Loya, Ruud & Romo, Eugene F. McMenamin and Jennifer D. Cantrell for Associated General Contractors of California as Amicus Curiae on behalf of Petitioner.

Walter & Prince and Fred Walter for Crane Owners Association, Inc., Mobile Crane Operators Group of Southern California, Inc., and Operating Engineers Local Union No. 3 as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent Workers' Compensation Appeals Court.

Butler Viadro, James G. Butler, Jr., Christopher A. Viadro and George W. Ellard for Respondent Paul Hunt.

OPINION

BANKE, J.—

INTRODUCTION

Respondent Paul Hunt was injured while assisting with the dismantling of a truck crane used during a shutdown operation at a refinery. Hunt had been helping on another crane at the jobsite, and, along with two ironworkers on the rigging crew, was told by the general foreman to help with the dismantling. Hunt was injured when a section of the boom fell eight inches to the ground and onto his lower leg and ankle. The Workers' Compensation Appeals Board (Board) sustained an award of additional compensation to Hunt under Labor Code section 4553,[1] concluding his injuries were caused by the "serious and willful misconduct" of the operator of the crane and the general foreman, both of whom were determined to be "managing officers" of petitioner Bigge Crane and Rigging Co. (Bigge Crane). Bigge Crane challenges the award, contending (a) the operator of the crane was not a "managing officer" of the company within the meaning of section 4553 and therefore his conduct cannot support an award of additional compensation and (b) the general foreman, even assuming he qualifies as a "managing officer," did not engage in "serious and willful misconduct." We agree with both points and annul the award of additional compensation.

FACTUAL AND PROCEDURAL BACKGROUND

On the day of the accident, Mark Mom was told to disassemble ("rig out") a truck crane he had been operating for approximately six weeks at the Chevron Oil refinery in Richmond, California. Mom had worked around or on cranes for more than 30 years, first as an oiler (who assists the operator of a "two-man" crane) and, beginning in 1980, as an operator. As an oiler, Mom

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

was directed by the crane operator to do such things as checking and maintaining the level of machine fluids, cleaning and moving the crane, and setting up the crane at the jobsite. When he became an operator, he, in turn, gave such directions to the oiler when he worked on a "two-man" crane. The customer, jobsite superintendent or foreman would tell Mom what task he was to perform with the crane; however, Mom was in charge of the actual functioning of the crane. He would, for example, determine how to enter a jobsite to avoid obstacles and power lines, where to locate the crane and how loads would be hoisted and put in place. He would start and stop the crane as he believed necessary. When he was directed to disassemble a crane, he both performed that task (often by himself or with only the oiler) and gave directions to anyone who helped him. He was responsible for doing crane work as safely as possible.

Mom began working periodically for Bigge Crane in the mid-1990's. By 1998, he was a certified and licensed crane operator, which required both written and practical tests. In January 2002, he was hired by Bigge Crane to operate a 90-ton Peck & Hiller truck crane at the Chevron refinery jobsite. Prior to the work at the refinery, he attended site-specific training provided by Chevron covering safety procedures, personal protection, emergency procedures and job duties of the personnel onsite. The training also reviewed safety procedures and protocols for the cranes.

Mom was assigned to the night shift. At the start of the shift, the entire Bigge Crane work crew gathered at the job shack to stow their personal gear and attend a preshift meeting. The 10- to 15-minute meeting was conducted by the Bigge Crane general foreman, who would tell the crew what they would be doing and with whom they would be working. The crew would then go to their assignments. Mom would go to the Peck & Hiller crane with his oiler, Jason Strode, and often would be working with ironworkers, all of whom were part of the Bigge Crane rigging crew, and who would, among other things, secure the loads hoisted by the crane.

On the day of the accident, Mom was called in for the day shift, and was told by Curtis Embry, the general foreman and supervisor for that area of the jobsite on that shift, to disassemble the crane. Embry, in turn, had been told by Chevron's supervisor on the job to have the crane dismantled. Embry had been trained in rigging safety and, as the general foreman, was responsible for seeing that rigging operations were conducted safely. Typically, after assigning operators and workers to their tasks, Embry would hold a safety meeting reviewing concerns and precautions in connection with the specific tasks.

Mom had disassembled hundreds of one-man cranes and more than 30 "two-man" cranes while working at Bigge Crane, and he and his oiler, Strode, had reviewed the dismantling process for the Peck & Hiller crane. Strode, however, was not dispatched to the refinery that day, so Chevron's rigging department told Mom he could have whomever he wanted to work as the oiler. Mom asked for Dave McGarry, another experienced operator and oiler. McGarry joined Mom at the crane after Mom had already brought it off the blocks. McGarry turned the crane, counterweights were set, Mom let the boom down so it touched the ground, the ball and block and jib lines were unhooked, and the jib strut was lowered.

In the meantime, Embry told the operator of another crane (an 80-ton truck crane) and Hunt, who was working as the oiler, to go and assist Mom. He also told two ironworkers, who were part of the rigging crew assisting with the crane work, including disassembly, to help Mom. Embry also went over to help. Mom continued with the dismantling process, giving instructions to those assisting. Embry did not stop the work, or ask Mom to do so, for a safety meeting. Embry viewed the task as "just another job" over the course of the day.

McGarry was then called away to operate another crane, and Hunt took over as the oiler. At one point, while Mom was in the cab of the crane, he called out to Embry that the ironworkers were performing work out of sequence, specifically, starting to remove the tip of the boom, and needed to stop momentarily. Embry stopped the workers, and Mom explained several other tasks needed to be done first. The tasks were accomplished, the work continued, and the tip was removed without incident.

Before the tip was removed, Embry was called away to another area by Chevron's supervisor. At the time he left, Embry saw there were "at least 16" "cribbing" blocks (six-by-eight-inch wooden blocks, four feet long) "available to be used." He knew the blocks were for use under the boom sections, and also knew blocks had already been placed under the tip of the boom as it was removed.

The disassembly of the crane continued. When the ironworkers started hammering several pins out of the next boom section, Mom again exited the cab of the crane, walked over to where they were working and had them stop until blocks were placed. An assist crane that had been brought over lifted the

boom, and Mom placed two blocks under the section. Instead of returning to the cab to tighten the bridle (for cantilever support), Mom walked over to where Hunt was standing, told the two ironworkers to stand back, called for everyone to have their feet out of the way and pounded a bottom pin. Mom thought his feet were sufficiently out of the way and did not look to see if Hunt's feet were also clear. The boom section and the one adjoining it, each weighing approximately 4,000 pounds, dropped about eight inches, the adjoining section dropping onto Mom's foot and Hunt's lower leg and ankle.

The boom sections dropped because there was insufficient support under one of the sections. Mom had been blocking booms for over 30 years, had read industry standards and publications and had twice taken tests on the task and performed well. This time, however, he had gotten distracted by having to stop and redirect the ironworkers and was not cognizant at the time of the accident that blocks were not in place under the adjoining section. Had he followed his usual sequence, he would have returned to the cab and tightened the bridle for cantilever support, and only the oiler would have been on the boom removing the pins.

Hunt filed a petition for additional compensation under sections 4553 and 4553.1, alleging his injury was caused by "serious and willful misconduct" on the part of Bigge Crane. Following an evidentiary hearing at which Hunt, Embry and McGarry testified, and at which Mom's testimony before the Occupational Safety and Health Appeals Board was introduced into the record, the workers' compensation administrative law judge (WCJ) issued findings and an award. The WCJ found the injury was caused by "serious and willful misconduct of a managing representative" of Bigge Crane[2] consisting of (1) "placing the applicant in a knowing and obvious position of danger without safety precaution" and (2) violating safety order, California Code of Regulations, title 8, section 4992, by failing to properly block a boom being disassembled. In his "Opinion on Decision," the WCJ identified Embry as a "managing representative" of Bigge Crane because he "had authority to tell other foreman what particular jobs were to be performed and was responsible to ensure that rigging out was done safely." Alternatively, the WCJ identified Mom as a "managing representative" because "it appears that general discretionary power of direction was delegated to [him]."

Bigge Crane timely filed a petition for reconsideration, which was denied by the Board, which incorporated and adopted the report and recommendation on reconsideration of the WCJ. Bigge Crane filed the instant petition for writ of review pursuant to section 5950.

---

[2] There is no indication in the record why the WCJ used the terminology "managing representative," rather than the term "managing officer" used in the statute (§ 4553, subd. (c)).

## DISCUSSION

██ Whether a workplace injury is caused by the "serious and willful misconduct" of a company's "managing officer" as those terms are used in section 4553 is a significant issue.[3] As the Supreme Court explained in *Lambreton v. Industrial Acc. Com.* (1956) 46 Cal.2d 498 [297 P.2d 9], "a claim for normal benefits and a claim for increased benefits by reason of serious and wilful misconduct are *not* sought upon the same general set of facts, nor do they involve merely a difference or change in legal theory. The relief sought is not the same; the legal liability is not the same; and the 'proceedings' to recover the benefits as respectively provided are recognized as being different. (Lab. Code, § 5407.) Normal benefits automatically follow from an injury within a covered employment relationship, whereas the additional award based on serious and wilful misconduct of the employer is an *additional* award which, although denominated and regarded for administrative purposes as 'increased compensation,' is actually of the nature of a penalty, which is imposed . . . only upon proof of the aggravated criminal or quasi-criminal behavior which constitutes serious and wilful misconduct, and against which the employer cannot purchase insurance. (*Mercer-Fraser Co.* v. *Industrial Acc. Com.* (1953) . . . 40 Cal.2d 102, 108, 121 [251 P.2d 955], and authorities there cited; Ins. Code, § 11661.)"[4] (*Lambreton*, at p. 504, fn. omitted.)

Bigge Crane contends the award of additional compensation in this case cannot be sustained because no "executive, managing officer or general superintendent" of the company engaged in "serious and willful misconduct." It asserts the crane operator, Mom, was not a "managing officer" of the company, and its general foreman, Embry, even assuming he was a "managing officer," did not engage in "serious and willful misconduct." Hunt maintains the WCJ's determinations that both Mom and Embry qualify as "managing officers" of Bigge Crane, and that both engaged in "serious and willful misconduct," are supported by the record. As we discuss in the following sections, we conclude that under the governing legal standards, Mom was not a "managing officer" of Bigge Crane and Embry's conduct did not rise to the level required to constitute "serious and willful misconduct."

---

[3] Section 4553 provides in pertinent part: "The amount of compensation otherwise recoverable shall be increased one-half, together with costs and expenses not to exceed two hundred fifty dollars ($250), where the employee is injured by reason of the serious and willful misconduct of any of the following: [¶] . . . [¶] (c) If the employer is a corporation, on the part of an executive, managing officer, or general superintendent thereof." (§ 4553.)

[4] Although the pertinent statutes utilize the spelling "willful" (§§ 4553, 4553.1), many cases use the spelling "wilful." Except when quoting from cases, we use the statutory spelling.

*Standard of Review*

Our standard of review in a writ of review proceeding is well established. "[W]here the evidence is in substantial conflict or is susceptible of conflicting inferences the finding of the commission . . . is final and it is our duty to uphold such finding (*California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1946), 27 Cal.2d 536, 541–542 [165 P.2d 669]), and . . . questions as to the weight of the evidence and the credibility of the witnesses are for the commission and if there is any evidence, whether direct or by reasonable inference, which will support the commission's finding, the reviewing court has no power to disturb it. (*Nielsen* v. *Industrial Acc. Com.* (1934), 220 Cal. 118, 122 [29 P.2d 852].)" (*Mercer-Fraser Co. v. Industrial Acc. Com., supra,* 40 Cal.2d at pp. 114–115 (*Mercer-Fraser*).)

However, whether "in any given case serious and wilful misconduct is shown, inherently presents questions of both fact and law. Insofar as the issues may relate to the credibility of witnesses, the persuasiveness or weight of the evidence and the resolving of conflicting inferences, the questions are of fact. But as to what minimum factual elements must be proven in order to constitute serious and wilful misconduct, and the sufficiency of the evidence to that end, the questions are of law." (*Mercer-Fraser, supra,* 40 Cal.2d at p. 115; accord, *Rogers Materials Co. v. Industrial Acc. Com.* (1965) 63 Cal.2d 717, 721 [408 P.2d 717] (*Rogers Materials*); *Hawaiian Pineapple Co. v. Industrial Acc. Com.* (1953) 40 Cal.2d 656, 662 [255 P.2d 431] (*Hawaiian Pineapple*).) So, too, whether an employee is "an executive, managing officer, or general superintendent" of a corporate employer such that his or her conduct can be the basis of an award of additional compensation for "serious and willful misconduct" is a mixed question of fact and law. (See *Cal. Shipbuilding Corp. v. Ind. Acc. Com., supra,* 27 Cal.2d at pp. 540–542 (*California Shipbuilding*) [discussing legal standard and holding evidence sufficient to find shipwright foreman a "managing officer" or "general superintendent"]; *Vega Aircraft v. Industrial Acc. Com.* (1946) 27 Cal.2d 529, 533 [165 P.2d 665] (*Vega Aircraft*) [discussing legal standard and holding assistant foreman of department was a "managing officer" or "general superintendent"]; *Bechtel etc. Corp. v. Ind. Acc. Com.* (1944) 25 Cal.2d 171, 174–177 [153 P.2d 331] (*Bechtel*) [discussing legal standard and holding foreman of truck crane crew not a "managing officer" or "general superintendent"].)

*The Crane Operator Was Not a "Managing Officer" of Bigge Crane*

Bigge Crane contends Mom, the crane operator, was not "an executive, managing officer or general superintendent" of the corporation and therefore

his conduct cannot be the basis for an award of additional compensation for "serious and willful misconduct." Hunt contends Mom qualifies as "a managing officer" because he was in charge of all facets of operating the crane and gave instructions to the oiler and ironworkers helping him disassemble it. We conclude Mom, as the operator of a single piece of heavy equipment, performing a specific, assigned task, was not "an executive, managing officer, or general superintendent" of the company within the meaning of section 4553 and therefore the award of additional compensation cannot be sustained on the basis of his conduct.

Three cases in particular inform our analysis of this issue. The first is *Bechtel, supra,* 25 Cal.2d 171. In *Bechtel,* the injured employee was one of a four- or five-member crew operating a truck crane. The crew was supervised by a foreman who had been told to go to a particular location on the refinery jobsite and load pipe onto a trailer, but had received no specific instructions on how to load the pipe. The foreman directed the crew to park the crane in a spot underneath several high-tension electrical lines, about 35 feet overhead. The boom of the crane, as rigged, was 60 feet long, but could have been shortened to five or 10 feet. While the employee was holding a hook attached to the boom, the boom came in contact with the electrical lines, and he was burned. (*Id.* at pp. 172–173.) The Industrial Accident Commission found the injury was caused by the employer's serious and willful misconduct, namely violating an electrical safety order prohibiting the operation of a crane within six feet of high-voltage wires. (*Id.* at p. 173.) The Supreme Court vacated the award of additional compensation on the ground the foreman of the crane crew, the only supervisory employee guilty of violating the safety order, was not an " 'executive, managing officer, or general superintendent' " of the company. (*Id.* at pp. 174–177.)

 The court explained " '[a]n executive or managing officer' is 'a person in the corporation's employ, either elected or appointed, who is invested with the *general conduct and control* at a particular place of the business of a corporation.' (Italics added.) (*E. Clemens Horst Co.* v. *Industrial Acc. Com.* (1920), 184 Cal. 180, 190 [193 P. 105].) A 'managing agent or a managing representative is one who has *general discretionary powers of direction and control*—one who may direct, control, conduct or carry on his employer's business or any part or branch thereof.' (Italics added.) (*Gordon* v. *Industrial Acc. Com.* (1926), 199 Cal. 420, 427 [249 P.2d 849].)" (*Bechtel, supra,* 25 Cal.2d at p. 174.) " 'While the terms of the . . . [statute] have been broadened with each amendment, the [L]egislature has refrained from making the employer liable for the misconduct of every person exercising authority on the employer's behalf. On the contrary, the class of persons whose

misconduct will result in the imposition of such liability *still remains limited.'* " (*Ibid.*, quoting *Green v. Industrial Acc. Com.* (1933) 130 Cal.App. 337, 340–341 [19 P.2d 1029].)

The supervisor of the *Bechtel* crane crew did not fall within this limited class of persons. His supervisorial authority "was limited to the direction of the crew of one truck crane. That crew was employed in performing a specifically directed operation (loading pipe onto a trailer) which was only a single detail of the work in progress" at the refinery. (*Bechtel, supra*, 25 Cal.2d at p. 176.) The supervisor did "not have general supervision over truck cranes, or crane crews, or loading operations." (*Ibid.*) Other workers and other crews were not under his direction, and he received " 'orders all day long.' " (*Id.* at p. 177.) In short, he "did not have charge of a 'part or branch' of his employer's business comparable to the excavation of an entire gravel pit or the erection of an entire building. It cannot be said that the single truck crane, operating under the conditions related, was a 'department' over which he had authority." (*Ibid.*)

The second case is *Vega Aircraft, supra*, 27 Cal.2d 529, in which the injured employee worked in the experimental department of an aircraft manufacturer. The employee's *immediate* supervisor was the work "group leader," who was supervised, in turn, by the "assistant foreman" of the experimental department. (*Id.* at pp. 531–532.) The work group leader had provided instructions for the testing of an airplane-engine radiator and was aware a plug had blown out of the radiator assembly several times during the testing process. He had discussed the problem with the employee and assistant foreman, and made modifications in an attempt to stop the problem, but to no avail. The employee was injured when the plug blew out again and struck him in the face, permanently injuring an eye. (*Ibid.*) The assistant foreman was not only aware of the continuing problem, but had made a joke about it before leaving on the evening of the accident. (*Id.* at p. 532.) Although the overall management of the experimental department was in the hands of the department foreman, on the swing shift, the assistant foreman " 'was in complete charge of the department' " and invested with general discretionary power of direction and control of the experimental department on that shift. (*Id.* at p. 533.)

The court explained that in *Bechtel* it had "rejected the view that any employee who has authority to give orders to other employees is necessarily, by virtue of such authority, an executive or managing officer or general

superintendent" of a corporate employer. (*Vega Aircraft, supra*, 27 Cal.2d at p. 533.) The situation in *Vega Aircraft* was different, and the court now "reject[ed] the view that because a corporation's business is carried on in many departments, both night and day, the corporation is insulated from responsibility for the serious and wilful misconduct of a supervisory employe[e] to whom it has delegated general discretionary power of direction of a relatively small but integrate department during one shift." (*Ibid.*) Such was the role of the assistant foreman on the swing shift. Accordingly, his conduct subjected the company to an award of additional compensation. (*Ibid.*)

The third case is *California Shipbuilding, supra*, 27 Cal.2d at page 536, in which a "shipburner" was injured when he stepped through an unguarded venthole on a ship under construction. The employee's immediate superior, the foreman of the burners, was not connected with the failure to place guards around the ventholes. (*Id.* at pp. 538, 540.) Rather, placing guards was the province of the shipwright foreman, who had not followed normal procedures because workers had been " 'snowed under' " and the cranes required to put the guards in place were in use on other tasks. (*Id.* at pp. 539–540.) The Supreme Court rejected the company's assertion the shipwright foreman was not a "managing officer or general superintendent" whose conduct could support an award of additional compensation.

The shipwright foreman "was invested with general discretionary powers of direction and control of an integrate department or division of petitioner's business, namely, compliance with section 1827 of the Ship and Boat Building Safety Orders and the setting of every piece of steel in the ship under construction on Way 5 in petitioner's Terminal Island yard. If petitioner's facilities were so limited that it could build only one ship at a time, it would be quite obvious that the person who had control over those portions of the business could properly be found . . . to be a managing officer or general superintendent. [Citation.] The fact that petitioner may have other ways and many employe[e]s in positions of higher rank than that of [the shipwright foreman], cannot change the fact . . . that petitioner delegated to [him] general discretionary control of a substantial unitary portion of its shipbuilding operations." (*California Shipbuilding, supra*, 27 Cal.2d at p. 540.)

The court further explained the role of the shipwright foreman was distinctly different from that of the truck crane foreman in *Bechtel*. "The supervisory employe[e] [in *Bechtel*], whose status was there in controversy, was foreman of the crew of one truck crane only; he 'received orders all day long'; he was in charge of a single specifically designated operation but not of an integrate division of his corporate employer's business. The only evidence as to the extent of his authority tended to show that he had no

general discretionary powers of direction or control of a substantial and integrate part, branch, division, or department of his employer's business." (*California Shipbuilding, supra,* 27 Cal.2d at p. 541, quoting *Bechtel, supra,* 25 Cal.2d at p. 177.)

We conclude the circumstances here are akin to those in *Bechtel,* rather than to those in *Vega Aircraft* or *California Shipbuilding.* Like the supervisor of the truck crane in *Bechtel,* Mom was told where he was to work and what his specific task was, in this case disassembling the truck crane so it was ready to move to another location. Like the supervisor in *Bechtel,* Mom was not told how to do his assigned task. And like the supervisor in *Bechtel* who was in charge of four or five employees, Mom gave directions to five other employees. As the Supreme Court explained in *Bechtel,* the fact that a minor supervisory employee, like Mom, provides *direction to* a handful of workers assigned to help with a specific task, does not make that employee a "managing officer, or general superintendent" of the company. Indeed, in many instances where more than one worker is sent to perform a specific task, one of the workers will coordinate and/or direct the work. That is not the kind of "supervising" employee contemplated by section 4553 whose conduct is reflective and representative of the company and can thereby subject the company to an award of additional compensation. If it were, the class of persons whose misconduct could result in the imposition of such punitive liability would be nearly *unlimited.* However, as the Supreme Court stated in *Bechtel,* " 'the class of persons whose misconduct will result in the imposition' " of liability under section 4553 " 'still remains limited.' " (*Bechtel, supra,* 25 Cal.2d at p. 174, quoting *Green v. Industrial Acc. Com., supra,* 130 Cal.App. at pp. 340–341.)

Hunt contends Mom can be classified as a "managing officer" because, as the operator of the crane, Mom had control over all facets of its operation. For example, when Mom was sent to a jobsite to do crane work, he determined how to access the site with the crane and where to place it, he instructed the oiler when to perform his duties, he determined how and when loads would be hoisted, he could start and stop the operation of the crane, and he was responsible for operating the crane safely. When he was told to disassemble a crane, he similarly determined where to place it and gave instructions to the oiler and any other workers who helped with the task. However, all of this is part and parcel of the job of a crane "operator," and none of this is materially different from the circumstances in *Bechtel.* Mom was the operator of a single truck crane, which was only one of a number of cranes used at the Chevron jobsite, who performed specific tasks assigned by his supervisors. He did "not have general supervision over [the Bigge] cranes, or crane crews, or loading operations" (*Bechtel, supra,* 25 Cal.2d at p. 176), and he had "no general discretionary powers of direction or control of a

substantial and integrate part, branch, division, or department of his employer's business." (*California Shipbuilding, supra,* 27 Cal.2d at p. 541.)

■ Mom admitted crane operators are often characterized in the field as "the captain of the ship." Seizing on this, Hunt contends Mom thus had a stature equivalent to the assistant foreman of the experimental department in *Vega Aircraft* and the shipwright foreman in *California Shipbuilding.* We disagree. Whether an employee is "an executive, managing officer, or general superintendent" is not determined by euphemism, but by the actual scope and nature of the employee's job responsibilities. The operator of a truck crane may sit in the driver's seat and control that piece of equipment, and, as such, think of himself or herself as the "captain of the ship." But that does not change the fact the crane is a single piece of heavy equipment, performing an assigned task; it is not anything like an oceangoing "ship," manned by a crew of dozens, if not hundreds, operating multiple mechanical and life-support systems, and transporting hundreds, if not thousands, of seafarers. In short, Mom "did not have charge of a 'part or branch' of his employer's business comparable to the excavation of an entire gravel pit or the erection of an entire building," or the complete direction of an integrate department, or the construction of the steel framing of an entire oceangoing vessel. (*Bechtel, supra,* 25 Cal.2d at p. 177; cf. *Mercer-Fraser, supra,* 40 Cal.2d at pp. 111–114, 120–121; *California Shipbuilding, supra,* 27 Cal.2d at pp. 540–541; *Vega Aircraft, supra,* 27 Cal.2d at p. 533; *Gordon v. Industrial Acc. Com., supra,* 199 Cal. at pp. 425–427.)[5]

■ Hunt also contends "general discretionary power of direction" had been "delegated" to Mom. This was the basis on which the WCJ concluded Mom was a "managing officer" and why the WCJ believed *Bechtel* was distinguishable. The WCJ stated Mom "had power of direction over the iron workers as well as his oiler" and that the responsibility of the general foreman, Embry, "to ensure the [safety of the] rigging out" had been "delegated" to the crane operators, including Mom. As the Supreme Court explained in *Bechtel,* and as we have discussed above, the fact an employee may have some supervisory authority and the "power of direction" over some employees does not make that employee a "managing officer" of the company for purposes of section 4553. Mom gave directions to five employees assisting with the specific task of dismantling the crane. In *Bechtel,* the foreman supervised a crane crew of four or five employees. We see no material distinction between this case and *Bechtel.*

---

[5] Although we have reviewed the amici curiae brief filed by the Crane Owners Association, Inc., Mobile Crane Operators Group of Southern California, Inc., and Operating Engineers Local Union No. 3, many of the proffered "facts" therein are not part of the record and we have not considered them.

Mom had, indeed, been charged by his employer with operating the crane safely, and thereby, at the very least, implicitly with complying with applicable safety orders. We have no doubt, however, the foreman of the crane crew in *Bechtel* was also charged with operating the crane safely—indeed, we cannot fathom any operator of a piece of sophisticated heavy equipment not being charged with operating the machinery safely and in compliance with applicable safety orders. The record does not support the suggestion that Bigge Crane's supervisors, like Embry, washed their hands of responsibility for job safety. On the contrary, Embry testified he was responsible for safe rigging operations. He further testified that even if Mom was in charge of operating the crane, he would follow Mom's directions in connection with crane tasks only so "long as it's not unsafe."

In final analysis, the WCJ's decision suggests someone at the scene of the accident had to be identified as a "managing officer," otherwise the employer would be "insulat[ed]" from its "responsibility of ensuring compliance with the safety order" requiring blocking of the boom sections. However, as *Bechtel* illustrates, a "managing officer" may not be on the scene at the precise moment a safety order is violated and an injury occurs. In *Bechtel*, the safety order that was violated prohibited the operation of equipment within six feet of high-voltage lines. (*Bechtel, supra,* 25 Cal.2d at p. 173.) The foreman of the crane crew "was the only supervisory employee . . . guilty of violation of the safety order." (*Id.* at p. 174.) But that did not mean the foreman was therefore a "managing officer" of the company. Indeed, almost by definition, a "managing officer" cannot and will not be at all areas of a jobsite at the same moment in time. That proximal reality does not alter the applicable legal standard.

*Cal. Shipbuilding Corp. v. Ind. Acc. Com.* (1947) 31 Cal.2d 270 [188 P.2d 27], underscores this point. In that case, the injured employee worked on a locomotive crane crew on the night shift and sustained injuries when the boom, which was extended to about 59 feet, came into contact with high-voltage lines about 44 feet overhead. (*Id.* at p. 272.) The court did not even suggest the operator of the locomotive crane was a "managing officer" of the company. Rather, the court held it could "readily be inferred that a managing agent" of the company was "guilty" of "reckless disregard for the safety of other employe[e]s" in light of the following facts: crane crews had been required to work for several years in the area, the area was littered with high-voltage lines, some of which had been removed because crews " 'were running into them too often,' " the area was so poorly lit it was impossible to see above the crane, the surface area was so rough " 'hoists were continually dropping loads' " requiring locomotive cranes to be dispatched at night to clear the dropped loads, a similar accident had occurred the year before at the same location under similar circumstances, and that accident "was known to

the superintendent of transportation and to the foreman who dispatched the crane to the road." (*Id.* at pp. 271–274.)

■ Expressing some doubt as to whether even the superintendent or foreman qualified as a "managing officer" of the company, the court stated an inference could fairly be drawn that an authoritative corporate officer was well aware of the obviously hazardous conditions. The court explained: "In the situation of a single instance of, or a temporary or new occurrence of conditions amounting to, serious misconduct it is necessary, in order to attribute such misconduct to a corporate employer, to show with reasonable particularity that the reckless disregard for safety was on the part of some particular person with general discretionary power of direction and control of the integral part of the business wherein the misconduct took place. (*Bechtel*[, *supra*,] 25 Cal.2d 171, 174–176 . . . ; *Vega Aircraft*[, *supra*,] 27 Cal.2d 529, 533; *California Shipbuilding*[, *supra*,] 27 Cal.2d 536, 546 . . . ; *California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1944), 64 Cal.App.2d 622, 627 [149 P.2d 432].) But in a situation where there are obvious, fixed, long-maintained conditions of hazard, and where crews are repeatedly required to work thereunder, it can be inferred that such conditions must have been known to responsible managing agents." (*Cal. Shipbuilding Corp. v. Ind. Acc. Com., supra*, 31 Cal.2d at p. 274.)

We are concerned here with the former situation identified by the court, governed by the *Bechtel* line of cases. As we have discussed, we conclude *Bechtel* is the most apposite of the cases and leads to the conclusion the crane operator, Mom, was not a "managing officer" of Bigge Crane. Therefore, Mom's conduct cannot support the award of additional compensation.

*The General Foreman Did Not Engage in "Serious and Willful Misconduct"*

We now examine the conduct of Embry, who was Bigge Crane's general foreman at the Chevron jobsite when the accident occurred. We do not decide, but rather assume for purposes of analysis, as has Bigge Crane, that Embry qualifies as a "managing officer" of the company.

The watershed case on "serious and willful misconduct" is *Mercer-Fraser, supra*, 40 Cal.2d 102. In *Mercer-Fraser*, the Supreme Court assumed, without holding, that the deliberate decision of the company's chief engineer and superintendent of maintenance and construction to not provide additional bracing to prefabricated sections of a building under construction, despite numerous warnings about the stability of the sections and the fact the weather was windy, would be sufficient to support a finding of "serious and willful misconduct." (*Id.* at pp. 120–121.) The court concluded the findings actually made by the commission, however, were consistent with a determination of

negligence only and thus could not support the award of additional compensation. (*Id.* at pp. 124–127.)

The Supreme Court discussed the meaning of serious and willful misconduct at length, contrasting such conduct with conduct that is negligent or even grossly negligent. (*Mercer-Fraser, supra,* 40 Cal.2d at pp. 116–118.) " 'Wilful misconduct . . . necessarily involves deliberate, intentional, *or wanton* conduct in doing or omitting to perform acts, with knowledge or appreciation of the fact, on the part of the culpable person, *that danger is likely to result therefrom.*' " (*Id.* at p. 117, quoting *Porter v. Hofman* (1938) 12 Cal.2d 445, 447 [85 P.2d 447].) " 'Wilfulness necessarily involves the performance of a deliberate or intentional act or omission regardless of the consequences.' " (*Mercer-Fraser,* at p. 117, quoting *Porter,* at p. 448.)

" ' "Wilful misconduct" means something different from and more than negligence, however gross. The term "serious and wilful misconduct" is described . . . as being something "much more than mere negligence, or even gross or culpable negligence" and as involving "conduct of a quasi criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury, or with a wanton and reckless disregard of its possible consequences[.]" . . . The mere failure to perform a statutory duty is not, alone, wilful misconduct. It amounts only to simple negligence. To constitute "wilful misconduct" there must be actual knowledge, or that which in the law is esteemed to be the equivalent of actual knowledge, of the peril to be apprehended from the failure to act, coupled with a conscious failure to act to the end of averting injury. . . .' " (*Mercer-Fraser, supra,* 40 Cal.2d at p. 117, italics omitted, quoting *Porter v. Hofman, supra,* 12 Cal.2d at p. 448.)

" 'While the line between gross negligence and wilful misconduct may not always be easy to draw, a distinction appears . . . in that gross negligence is merely such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, while wilful misconduct involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences. It seems clear that in excluding all forms of negligence as a basis for recovery in a guest case, the [L]egislature must have intended that to permit a recovery in such a case the thing done by a defendant must amount to misconduct as distinguished from negligence and that this misconduct must be wilful. While the word "wilful" implies an intent, the intention referred to relates to the misconduct and not merely to the fact that some act was intentionally done. In ordinary negligence, and presumably more so in gross negligence, the element of intent to do the act is present and any negligence might be termed misconduct. But wilful misconduct as used in this statute means neither the sort of misconduct involved in any negligence nor the mere intent to do

the act which constitutes negligence. Wilful misconduct implies at least the intentional doing of something either with a knowledge that serious injury is a *probable* (as distinguished from a possible) result, or the intentional doing of an act with a wanton and reckless disregard of its *possible* result.' " (*Mercer-Fraser, supra*, 40 Cal.2d at p. 118, quoting *Meek v. Fowler* (1935) 3 Cal.2d 420, 425–426 [45 P.2d 194].)

" ' Such intent and knowledge of probable injury may not be inferred from the facts in every case showing an act or omission constituting negligence for, if this were true, any set of facts sufficient to sustain a finding of negligence would likewise be sufficient to sustain a finding of wilful misconduct. As has been repeatedly declared, " 'wilful misconduct' means something more than negligence—more, even, than gross negligence." [Citations.]' " (*Mercer-Fraser, supra*, 40 Cal.2d at p. 118, quoting *Meek v. Fowler, supra*, 3 Cal.2d at p. 426.) "Manifestly, 'serious *and* wilful misconduct' cannot be established by showing acts any less culpable, any less deliberate, or any less knowing or intentional, than is required to prove wilful misconduct." (*Mercer-Fraser*, at p. 118.)

Measured against this rigorous standard, the Supreme Court concluded the commission's findings were "significant of nothing more culpable than negligence." (*Mercer-Fraser, supra*, 40 Cal.2d at p. 124.) For example, "findings . . . that the employer, through its general superintendent, failed and neglected to 'exercise that degree of prudence, foresight and caution which, under the circumstances, a prudent employer would then and there have' exercised, and . . . statements concerning what a 'prudent employer' would have done 'had it turned its mind to the fact' obviously do not establish serious and wilful misconduct, which, as has been shown, requires an act or omission to which the employer *has* 'turned its mind.' " (*Id.* at pp. 124–125.) "There [was] no suggestion that [he] was incompetent or inexperienced or that his employer . . . was itself guilty of misconduct in employing [him] for the job at hand." (*Id.* at p. 127.)

In *Sutter Butte Canal Co. v. Ind. Acc. Com.* (1953) 40 Cal.2d 139 [251 P.2d 975] (*Sutter Butte*), a companion case decided the same day as *Mercer-Fraser*, the Supreme Court also annulled an award of additional compensation. In *Sutter Butte*, an employee drowned when he fell from a concrete dam while removing "flashboards" from the top of the dam. Flashboards had been annually installed and removed, without incident, for some 32 years. (*Sutter Butte, supra*, at pp. 140–141.) Safety engineers had inspected the facility and never recommended any additional precautions. (*Id.* at p. 141.) The commission again based its award of additional compensation on findings the employer had failed and neglected to provide a safe place of employment and failed and neglected to use safety devices and safeguards to render the site

safe. (*Id.* at p. 142.) The court characterized the commission as being of the view "that 'something' should have been done" to prevent the accident, for example, furnishing lifelines or lifejackets, or providing a rowboat at the foot of the dam. (*Id.* at p. 143.) As the court explained, however, "[t]here [was] not the slightest evidence to support a finding that the petitioner deliberately sent its employe[e]s to work upon the dam either (1) knowing that the conditions thereon constituted an immediate hazard which would probably cause serious injury or death to one or more of them, or (2) that it so acted with positive, active, wanton, reckless and absolute disregard for possible consequences of that nature." (*Ibid.*)

The Supreme Court also annulled an award of additional compensation in *Hawaiian Pineapple, supra*, 40 Cal.2d 656. In *Hawaiian Pineapple*, an employee using a forklift to move items between a cannery and warehouse was struck by a train running on tracks between the two facilities. (*Id.* at pp. 658–659.) The employer had installed several warning devices to prevent accidents at the rail crossing and also had a safety program which included a requirement that forklift operators stop at the tracks before proceeding over them. (*Id.* at pp. 659–660.) The employer supplied an additional safeguard at the crossing, a watchman, during the " 'operating season' " from July to October, but not during the spring, when the accident occurred. (*Id.* at p. 660.) Further, the view of both operators and train crews was limited, a blinker warning light was unreliable during the "slack" season, and for a considerable time, operators had not been complying with the requirement that they stop at the tracks because they felt pressured by the amount of work. (*Ibid.*) The commission found the employer had failed to provide a safe worksite and " 'failed or omitted to provide and maintain proper and adequate safety devices to warn of the approach of switch engines.' " (*Id.* at p. 661.)

The court again emphasized the egregiousness of conduct required to support a finding of serious and willful misconduct. Conduct described "as 'wilful' as opposed to negligent conduct in any degree" involves "at least an intention to perform an act or omission with actual knowledge, or that which in law is deemed to be the equivalent of actual knowledge of the peril to be apprehended from the act or omission. While gross negligence may involve an intent to perform the act or omission, wilful misconduct involves the further intent that the performance be harmful or that it be done with a positive, active and absolute disregard of the consequences." (*Hawaiian Pineapple, supra*, 40 Cal.2d at p. 662.) "It was concluded in the *Mercer-Fraser* case that 'serious and wilful misconduct' as that expression is used in section 4553 of the Labor Code 'cannot be established by showing acts any less culpable, any less deliberate, or any less knowing or intentional, than is required to prove wilful misconduct.' It was stated in that case that 'the true rule is that serious and wilful misconduct is basically the antithesis of negligence, and that the two types of behavior are mutually exclusive; an act

which is merely negligent and consequently devoid of either an intention to do harm or of knowledge or appreciation of the fact that danger is likely to result therefrom cannot at the same time constitute wilful misconduct. . . .' " (*Id.* at pp. 662–663, quoting *Mercer-Fraser, supra,* 40 Cal.2d at pp. 118, 120.)

■ Thus, "[a] 'reckless disregard' of the safety of employees is not sufficient in itself unless the evidence shows that the disregard was more culpable than a careless or even a grossly careless omission or act. It must be an affirmative and knowing disregard of the consequences. Likewise, a finding that the 'employer knew or should have known had he put his mind to it' does not constitute a finding that the employer had that degree of knowledge of the consequences of his act that would make his conduct wilful. The standard requires an act or omission to which the employer *has* 'put his mind.' " (*Hawaiian Pineapple, supra,* 40 Cal.2d at p. 663, quoting *Mercer-Fraser, supra,* 40 Cal.2d at p. 124.)[6]

Looking at the record, the court concluded "it [was] devoid of any substantial evidence that the employer intended to do harm, or that it had actual knowledge of the probable consequences of its failure to provide more adequate safety devices or a safer place to work or that it exercised an affirmative and knowing disregard for the safety of the injured employee." (*Hawaiian Pineapple, supra,* 40 Cal.2d at p. 664.) While there was evidence a similar accident was avoided shortly before the accident at hand, the employer thereafter took additional steps to remove the hazard. "There [was] no evidence that the employer had knowledge of any kind that this remedy was inadequate, nor [did] the record reveal that there was any reason for it to believe that the circumstances which nearly caused a first accident continued to exist." (*Id.* at p. 665.)

In *Keeley v. Industrial Acc. Com.* (1961) 55 Cal.2d 261 [359 P.2d 34] (*Keeley*), the Supreme Court sustained an award of additional compensation. In that case, the testimony of the injured employee and the employer's foreman conflicted on several key points, and the commission believed the employee. The employee had been assigned to run a rice "bankout wagon," used to transport rice harvested in the field to the highway for loading onto trucks. The rice was offloaded from the wagon by the use of an auger. (*Id.* at

---

[6] The court also observed the "serious and willful misconduct" standard "works both ways." (*Hawaiian Pineapple, supra,* 40 Cal.2d at p. 664.) "While section 4553 provides for an additional one-half of the normal compensation where the employer's 'serious and wilful misconduct' causes the injury, section 4551 provides that 'Where the injury is caused by the serious and wilful misconduct of the injured employee, the compensation otherwise recoverable therefor shall be reduced one-half.' " (*Ibid.,* quoting § 4551.) Therefore, "[t]he words 'serious and wilful misconduct' must be given the same meaning in each section." (*Hawaiian Pineapple,* at p. 664.)

pp. 263–264.) According to the employee, the foreman became angry when the auger clogged. He cursed the employee, stopped the bankout motor, opened a trapdoor to the auger assembly and began clearing out the rice with his hands. When two other workers interrupted the foreman, he told the employee to continue and left with the other workmen. About 10 minutes later, the employee heard the bankout motor restart and the auger moved before he could get his hand out. (*Id.* at p. 264.) He yelled but could not be heard over the noise of the machine, which had been restarted by the foreman. (*Ibid.*) The foreman acknowledged that he knew it would be dangerous for anyone to put their hands into the auger and denied that any of the events recited by the employee had occurred. (*Id.* at p. 265.)

The court upheld the award of additional compensation, explaining it had not in *Mercer-Fraser* or *Hawaiian Pineapple* disapproved the rule established in *Henry J. Kaiser Co. v. Ind. Acc. Com.* (1947) 81 Cal.App.2d 818 [185 P.2d 353]. (*Keeley, supra,* 55 Cal.2d at pp. 267–268.) That rule provides that "willful misconduct is involved where the employer knowingly places the employee in a situation of obvious danger and takes no precautions to protect him." (*Id.* at p. 268.) "When an employee is ordered to work upon a piece of machinery in such a manner that he will probably be injured if the machinery is started, and nothing is done to protect him against this hazard, the commission is justified in finding that he has been 'intentionally subjected to known, serious, unnecessary and unreasonable hazards . . . .' " (*Ibid.*, quoting *Mercer-Fraser, supra,* 40 Cal.2d at p. 121.) "The facts show[ed] that [the foreman] ordered [the worker], an inexperienced laborer, to perform an obviously dangerous act—pulling rice from the auger with his hands. This was a fact to which the employer (through his foreman) *had* put his mind. [The foreman] testified that such an operation was dangerous. He knew that [the worker] could not be seen from the location where the bankout motor was operated. He knew that [the worker] could be seriously injured if the motor were started while he was still attempting to unplug the machine. He also knew that there were other men in the field, any one of whom might start the motor. And he knew that if he started the motor he would be unable to see whether anyone was working at the back of the wagon." (*Keeley,* at pp. 269–270.) Nevertheless, the foreman took no precautions whatsoever when he left the employee, not even telling him to turn off the motor of the tractor, to which the bankout wagon was attached, so the worker would at least be able to hear if someone began cranking the motor on the bankout wagon. (*Id.* at p. 270.) Thus, having deliberately put the employee in the face of an obvious and serious danger, but taking no precautions, he " 'evinced a reckless disregard' " for the employee's safety. (*Ibid.*; see also *Erickson v. Workmen's Comp. App. Bd.* (1970) 12 Cal.App.3d 388, 390–394 [90 Cal.Rptr. 706] [pressroom foreman knew it was dangerous to work around roller press without a guard while it was running, knew guards were removed during

washdown, knew that even during washdown the press continued to turn, although at a slower rate, knew another employee had caught his fingers in the press while it was running at a slow rate, and admitted the press could be washed down with the guards on].)

Neither *Mercer-Fraser*, *Hawaiian Pineapple*, nor *Keeley*, involved the "employer's violation of an express statute or commission safety order designed to protect employees." (*Hawaiian Pineapple, supra*, 40 Cal.2d at p. 665.) As Hunt points out, Bigge Crane was cited for violating several safety orders, including orders requiring employee training and the securing or blocking of crane booms.[7]

■■ As the Court of Appeal explained in *Grason Elec. Co. v. Industrial Acc. Com.* (1965) 238 Cal.App.2d 46 [47 Cal.Rptr. 439] (*Grason Electric*), while the violation of a safety order may have some bearing on whether an employer engaged in "serious and willful misconduct," the requisite standard that must be met is that set forth in *Mercer-Fraser* and *Hawaiian Pineapple*. "In 1959 the Legislature adopted Labor Code section 4553.1 dealing with awards for serious and wilful misconduct based upon violations of safety orders.[8] Before the enactment of section 4553.1, the employer could be charged with constructive knowledge of a safety statute or safety order

---

[7] Bigge Crane was initially issued four citations: (1) a "general" violation of California Code of Regulations, title 8, section 3203, subdivision (a)(7)(C) requiring employee training and instruction; (2) a "serious" violation of California Code of Regulations, title 8, section 1509, subdivision (b) requiring safe practices; (3) a "serious" violation of California Code of Regulations, title 8, section 1510, subdivision (a) requiring hazard and safety instructions; and (4) a "serious" violation of California Code of Regulations, title 8, section 4992 requiring the securing or blocking of crane booms. Bigge Crane contested the citations, and after a hearing, citations (2) and (3) were amended to "general" citations "due to a lack of evidence that there was a substantial probability that death or serious physical harm could exist as a result of either alleged violation." The parties then resolved the matter. The Division of Occupational Safety and Health (Division) agreed to withdraw citation (3) as "duplicative" of general citation (1). It also withdrew the "accident-related" classification that had been assigned to citation (4) and agreed to substantially reduce the penalty (from $22,500 to $2,700). Without admitting any violation, Bigge Crane, in turn, agreed to withdraw its appeal as to "general" citations (1) and (2) and to non-accident-related citation (4).

[8] Section 4553.1 currently provides: "In order to support a holding of serious and willful misconduct by an employer based upon violation of a safety order, the appeals board must specifically find all of the following:

"(1) The specific manner in which the order was violated.

"(2) That the violation of the safety order did proximately cause the injury or death, and the specific manner in which the violation constituted the proximate cause.

"(3) That the safety order, and the conditions making the safety order applicable, were known to, and violated by, a particular named person, either the employer, or a representative designated by Section 4553, or that the condition making the safety order applicable was obvious, created a probability of serious injury, and that the failure of the employer, or a representative designated by Section 4553, to correct the condition constituted a reckless disregard for the probably consequences."

(*Parkhurst* v. *Industrial Acc. Com.* [(1942)] 20 Cal.2d 826, 830 [129 P.2d 113].) With the adoption of section 4553.1, actual knowledge became a requisite. (See *Dowden* v. *Industrial Acc. Com.* [(1963)] 223 Cal.App.2d [124,] 128–129 [35 Cal.Rptr. 541]; see also, Comment, 42 Cal.L.Rev. 852, 860–861.) Additionally, section 4553.1 specifies various findings which must be made when serious and wilful misconduct is premised upon violation of a safety order. Except for the matter of actual versus constructive knowledge, section 4553.1 did not disturb judicially established standards of serious and wilful misconduct." (*Grason Electric, supra*, at pp. 50–51.)

Before *Mercer-Fraser* was decided, "the role of safety statutes and industrial safety orders in serious and wilful misconduct cases had been fairly well delineated. The employer's failure to comply with a safety statute or order was not serious and wilful misconduct, either *per se* or presumptively; rather, the nature of the regulation and the circumstances of the accident would determine whether or not the employer's actions should be characterized as serious and wilful misconduct." (*Grason Electric, supra*, 238 Cal.App.2d at p. 51.) "The *Mercer-Fraser* decision made no apparent change in the role of safety regulations as a factor of serious and wilful misconduct. It dealt with the other circumstances of the accident, principally the employer's conduct, making it plain that the judicial concept of serious and wilful misconduct would require a greater degree of deliberation and a more complete recognition of danger than had been supposed (see also *Keeley*[, *supra*], 55 Cal.2d 261, 268 . . . ; *Hawaiian Pineapple*[, *supra*], 40 Cal.2d 656, 663 . . .). Violation of a safety regulation, as a factor in the accident, would continue to play a role varying with the nature of the regulation." (*Id.* at p. 52.)

In *Grason Electric*, the foreman of a crew erecting street lighting standards was well aware of the safety order prohibiting work within six feet of a high-voltage line. (*Grason Electric, supra*, 238 Cal.App.2d at p. 50.) Nevertheless, one of the crew was electrocuted when a standard was hoisted into place and either came in contact with, or close enough to, the high-voltage line to allow arcing and conduction of the current. (*Id.* at p. 49.) The violated safety order dealt with such a "deadly and immediate peril" there was a commensurate Penal Code statute imposing criminal sanctions for moving equipment or materials within six feet of a highvoltage line. (*Id.* at p. 53.) Further, given the mechanics of the truck hoist and the size and configuration of the light standard, the risk of contact with the high-voltage line should have been "obvious to the foreman." (*Id.* at pp. 53–54.) Thus, the foreman effectively "took it upon himself to match his own judgment (such as it was) against the emphatic policy decreed by law and safety regulation. He deliberately took the gamble forbidden by law." (*Id.* at p. 55.) Given the context, and the "acute danger and inflexible" prohibition against the conduct

that occurred, the court held the foreman's decision could well be characterized as displaying "positive and reckless disregard" of the possible, catastrophic consequences. (*Id.* at pp. 53, 55.)

Measured against the legal standard explicated in the foregoing cases, Embry's conduct simply does not rise to the level of egregiousness required to establish "serious and willful misconduct." Hunt contends otherwise, asserting Embry "knowingly place[d] the employee in a situation of obvious danger and [took] no precautions to protect him." (*Keeley, supra,* 55 Cal.2d at p. 268.) Hunt points to the facts that Embry knew Hunt and the ironworkers he told to assist Mom had not attended a meeting dealing specifically with disassembly of the crane and knew Mom had had to stop the work because the ironworkers had gotten out of sequence.

Embry also knew, however, that Mom was an experienced crane operator and had immediately recognized that the ironworkers had gotten out of sequence and had corrected them. Embry further knew at the time he was called away from the work area, that the disassembly work had resumed, blocks were available for use in supporting the boom sections, and one section had already been blocked. Thus, by all appearances, the work was proceeding apace, under the direction of an experienced and vigilant operator. We therefore do not consider as significant the violation of the safety order requiring that crane booms be secured or blocked. Embry did not violate this order, Mom did. And for the reasons we have just discussed, there is no reason why Embry should have anticipated Mom would violate this order.[9]

Embry's conduct is not comparable to that of the foreman in *Keeley*, who told the employee to put his hands directly into an auger to try to clear it, with no precautions despite knowing the peril of doing so (*Keeley, supra,* 55 Cal.2d at pp. 269–270), or that of the superintendent in *Rogers Materials* who repeatedly watched the employee wash out the rotating drum of a concrete mixer driven by an unguarded chain and took no precautions despite knowing the obvious danger to the employee (*Rogers Materials, supra,* 63 Cal.2d at pp. 720–721), or that of the pressroom foreman in *Erickson* who knew washing down the roller press while it was turning was dangerous and knew a prior injury had occurred but continued to require the practice (*Erickson v. Workmen's Comp. App. Bd., supra,* 12 Cal.App.3d at pp. 390–394).

---

[9] The WCJ's decision focused principally on Mom's failure to block the adjoining boom section. However, as we have explained, Mom was not a "managing officer" of Bigge Crane and therefore the award of additional compensation cannot be sustained on the basis of his conduct. (See *Bechtel, supra,* 25 Cal.2d at p. 174 [although foreman of truck crane crew was "the only supervisory employee . . . guilty of violation of the safety order," he was not a "managing officer" of the company and therefore his conduct could not support the award of additional compensation].)

There is no evidence Embry "turned his mind" to and ignored a patent and obvious danger that made serious injury a *"probable* (as distinguished from a possible) result." (*Mercer-Fraser, supra,* 40 Cal.2d at p. 118.) While Embry knew serious injury could result if the boom sections were not blocked, at the time he was called away to another area of the jobsite, he knew Mom was an experienced operator, knew Mom was paying close attention to the workers helping with the disassembly, knew there were sufficient blocks for use as the boom was lowered, and knew one section had already been blocked. Embry could reasonably assume blocks would continue to be moved into place when needed—this was not "a deliberate omission to act, with knowledge or appreciation of the fact that [Hunt] would probably be injured by its omission." (*Rogers Materials, supra,* 63 Cal.2d at p. 724.)

Embry may have been negligent in not asking Mom to spend a few minutes going over the disassembly procedure with Hunt and the ironworkers Embry sent to help with the task. But his failure to do so was not sufficiently egregious to depart from the realm of negligence or gross negligence, and enter the realm of "serious and willful misconduct." As we have noted, Bigge Crane was issued two citations for violating safety orders requiring employee training and instruction, one a "general" citation and the other a "serious" citation.[10] As we have also noted, following an administrative hearing, the WCJ amended the "serious" citation to only a "general" one on the ground there was "a lack of evidence that there was a substantial probability that death or serious physical harm could exist as a result of [the] alleged violation." Thereafter, the Division withdrew one of the citations as "duplicative." Thus, it is apparent the alleged safety order violation was found by the WCJ to not be overly serious and was so treated by the Division. It certainly is not comparable to the violation of the safety order at issue in *Grason Electric,* prohibiting work within six feet of high-voltage lines and protecting against the "deadly and immediate peril" inherent in such "ultra-hazardous activity." (See *Grason Electric, supra,* 238 Cal.App.2d at pp. 53–54.) We therefore conclude this alleged safety order violation does not suffice to move Embry's conduct across the scale from negligence or gross negligence, to "serious and willful misconduct."

### DISPOSITION

We conclude the crane operator, Mom, was not a "managing officer" of Bigge Crane and therefore the award of additional compensation cannot be sustained on the basis of his conduct. We further conclude Bigge Crane's

---

[10] The WCJ cited only Mom's violation of the safety order requiring that crane booms be secured and blocked in support of his "serious and willful misconduct" determination. However, because Mom was not a "managing officer" of the company, his conduct, including his violation of this safety order, cannot support the award of additional compensation. (See fn. 9, *ante.*)

general foreman, Embry, even assuming he was a "managing officer" of the company, did not engage in "serious and willful misconduct" and the award cannot be sustained on the basis of his conduct. Accordingly, the award of additional compensation is annulled.[11]

Margulies, Acting P. J., and Dondero, J., concurred.

---

[11] Given our disposition, we do not reach Hunt's request for attorney fees under section 5801.